**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 2:26-cv-207 |
| U.S. Department of Justice | ) | |
| Antitrust Division | ) | Judge: |
| 450 Fifth Street, NW, Suite 4100 | ) | |
| Washington, DC 20530 | ) | Magistrate Judge: |
| | ) | |
| and | ) | **COMPLAINT** |
| | ) | |
| STATE OF OHIO, | ) | |
| 30 East Broad Street, 26th Floor | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OHIOHEALTH CORPORATION, | ) | |
| 3430 OhioHealth Parkway | ) | |
| Columbus, OH 43202 | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

The United States of America and the State of Ohio, for their Complaint against

Defendant OhioHealth Corporation ("OhioHealth"), allege as follows:

**INTRODUCTION**

1.      Healthcare costs weigh heavily on the minds and budgets of American families

and businesses. The mechanism that ultimately lowers costs for all patients and healthcare

consumers is robust and unrestrained competition. Americans deserve the benefits of vigorous

competition between healthcare providers. Rather than compete to serve patients in Columbus,

Ohio, OhioHealth has chosen to prevent competition from other providers. Through contractual

restrictions, OhioHealth restricts commercial health insurers ("payors") from offering health

plans that allow patients to share in the savings that come from choosing to use OhioHealth's lower-cost rivals.

2.     OhioHealth has thereby denied patients the ability to choose a health plan that may work better for them—a choice that patients would be free to make in a competitive market unburdened by OhioHealth's burdensome restrictions. OhioHealth's contractual restrictions insulate it from price competition and help to maintain its extremely high prices. The dynamic effect of these contractual restrictions is that OhioHealth is effectively preventing competitors from achieving scale with regard to patients as well as quality.

3.     OhioHealth is the dominant hospital system in Columbus. Since at least 2003, it has used its market power to protect its dominance—and its high prices—by blocking payors from offering patients health insurance plans that feature lower-cost hospitals and other providers and even from informing patients that lower-cost options are available.

4.     As a result, these restrictions deprive patients of a choice among a full spectrum of competitive health insurance plans, where patients could decide for themselves whether going to OhioHealth for care is worth the high prices it charges. If such plans were available, the employers and patients who choose them would benefit immediately from lower premiums and out-of-pocket costs.

5.     Further, without its unlawful contracts, OhioHealth would need to compete more vigorously against other providers. Those other providers could compete for additional patients by lowering their own prices, gaining both business and incentive to make quality-improving investments that would enhance their attractiveness. All employers and patients in the Columbus area would benefit from higher quality and lower prices as the healthcare marketplace became more competitive. More competition means patients and employers would get lower premiums,

lower out-of-pocket healthcare costs, and more insurance plan choices. Yet, OhioHealth's conduct prevents patients from receiving the real, tangible benefits associated with competition.

6.     The United States of America and the State of Ohio bring this civil antitrust action to stop OhioHealth from using unlawful contract restrictions that lessen healthcare competition in Columbus. OhioHealth's restrictions that deter the emergence and development of money-saving health insurance plans reduce competition among hospitals and other providers on both price and quality. The result is reduced choice of insurance plans, higher healthcare costs, and less competition for high quality healthcare for Columbus-area patients, employers, and payors, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Ohio's Valentine Act, Ohio Revised Code §§ 1331.01 *et seq*.

## OHIOHEALTH

7.     OhioHealth is an Ohio not-for-profit healthcare services corporation, with its principal place of business in Columbus, Ohio. OhioHealth owns or manages hospitals, outpatient facilities, physician groups, and other healthcare services throughout Ohio. Its flagship facility, Riverside Methodist Hospital, is in Columbus, Ohio. OhioHealth owns or manages 16 hospitals in Ohio and is attempting to acquire Fairfield Medical Center in Fairfield County, Ohio.

8.     OhioHealth is the dominant hospital system in the Columbus area. The Ohio State University Wexner Medical Center ("Ohio State") competes with OhioHealth in the Columbus area. Ohio State operates an academic medical center and research institution in Columbus that receives referrals for advanced care from throughout Ohio and the midwestern United States. OhioHealth also competes in the Columbus area with Mount Carmel Health System ("Mount Carmel"), which is owned by Trinity Health. Mount Carmel operates five hospitals in the Columbus area and holds a majority joint-venture interest in a sixth.

3

9. OhioHealth charges payors prices (in the form of "reimbursement rates") that are significantly higher than OhioHealth's competitors.

10. While higher priced, OhioHealth's services are not generally higher quality than those of its local rivals. Indeed, one widely used public measure of hospital safety, the Leapfrog Hospital Safety Grade, reports that OhioHealth's hospitals in the Columbus area often received lower grades than the hospitals of its primary competitors. Other publicly available quality metrics, like Centers for Medicare & Medicaid Services Five-Star Quality Rating System, similarly do not show OhioHealth to be of consistently higher quality than its primary Columbus-area competitors. OhioHealth nevertheless has extracted reimbursement rates from payors that are higher than those of Ohio State, a leading regional academic medical center that operates a top-tier medical school, conducts medical research, and trains physicians in advanced subspecialties through numerous fellowship programs. OhioHealth's prices are also higher than those of Mount Carmel.

11. OhioHealth can extract high reimbursement rates because it exerts market power over payors, as reflected in its high market share. OhioHealth's market power is built upon the scale, breadth, and configuration of its providers, including, among other things, its large size, its many locations, and its control of rural hospitals that payors need to include in at least some hospital networks to maintain network coverage. OhioHealth requires a payor that wants *any* of these providers in its network to include *all* of them in its network. To offer competitive insurance plans to Columbus-area patients, payors need to include access to OhioHealth's hospitals—as well as its many other facilities and providers—in at least some of their provider networks. OhioHealth's market power has enabled it to negotiate high reimbursement rates for

4

treating insured patients across a range of services. OhioHealth's market power is further evidenced by its ability to impose contractual restrictions on payors that reduce competition.

## JURISDICTION

12.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345. Plaintiff United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.     Plaintiff State of Ohio, by and through its Attorney General, brings this action, pursuant to Section 109.81(A) of the Ohio Revised Code, in its sovereign capacity and as parens patriae on behalf of the citizens, general welfare, and economy of the State of Ohio (a), pursuant to Section 16 of the Clayton Act, to prevent OhioHealth from violating Section 1 of the Sherman Act, 15 U.S.C. § 1; and (b), pursuant to its equitable and/or common law powers and Section 1331.11 of the Ohio Revised Code, to prevent OhioHealth from violating Section 1331.04 of the Ohio Revised Code.

14.     The Court has personal jurisdiction over OhioHealth under Section 12 of the Clayton Act, 15 U.S.C. § 22. OhioHealth maintains its principal place of business and transacts business in this District.

## VENUE AND INTERSTATE COMMERCE

15.     Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22. OhioHealth transacts business and resides in this District and the events giving rise to this action occurred in this District.

16.     OhioHealth engages in interstate commerce and in activities substantially affecting interstate commerce. OhioHealth provides healthcare services for which employers, payors, and individual patients remit payments across state lines. OhioHealth also purchases

supplies and equipment that are shipped across state lines, and it otherwise participates in interstate commerce.

## HOSPITAL COMPETITION BENEFITS PATIENTS AND EMPLOYERS

17.     Hospital systems and hospitals ("hospitals") participate in commercial insurance plans that payors sell directly to individuals and, more often, that payors contract with employers to offer to their employees. Payors individually negotiate reimbursement rates and contract terms with each hospital so that their members can use the hospital's services. Payors design the commercial features of each plan they sell, such as premiums, co-payments, and deductibles. Importantly, as part of their negotiations with hospitals, payors choose which hospitals and other providers will be included in each specific plan as well as how much members pay for various healthcare services.

18.     Many employers, or other plan sponsors such as unions, offer their employees or members a choice among insurance plans, as plans differ in what benefits they offer and consumers value these benefits differently. Payors generally offer broad network plans that appeal to consumers willing to pay a premium to have access to virtually all providers in their area. Payors in competitive markets—in other parts of Ohio and across the United States—also generally offer plans that allow their members to save money by using a more limited panel of cost-effective providers or by asking members to pay more for choosing more expensive providers. These plans create incentives for patients to use certain providers and are sometimes called "steered plans" because they may influence patients' decisions about where to receive treatment. These "steering" features reward competition by allowing hospitals or other providers to compete to be included or otherwise featured in the plans.

19.     Consumers deserve the benefit of a marketplace where they can pick from differently priced options. This is a common and basic feature of free and competitive markets.

6

Consumers see these options available to them in their everyday lives. For example, when consumers go to any Columbus grocery store, they can often choose from a range of options that could be considered "good/better/best." Consumers can choose a "best" brand item at a premium price. Consumers may instead choose the "better" or "good" brand at a lower price. The choice of a "better" or "good" brand at a lower price may be particularly attractive to a family looking to stay within a tight household budget.

20. Patients and their employers deserve the opportunity to make these choices when it comes to their healthcare. In other parts of Ohio and the United States, employers and patients choose from different health plans that vary in the size and composition of the provider network, the prices of health insurance premiums, and the cost to visit specific hospitals or other providers. Like the "better" or "good" brands in grocery stores, health plans that limit the availability of healthcare services from high-cost providers may particularly appeal to budget-conscious employers and patients.

21. Budget-conscious plans can take a variety of forms. But they all emphasize competition, either by creating competition among hospitals and other providers to be included in a network or among those hospitals and other providers to attract patients once the provider is included in a health network. The tools that can be used to create and offer these plans can be used either in combination with each other or on their own. Different features of many budget-conscious plans are described below.

22. **Narrow network plans** offer employers and individuals the ability to reduce the cost of health insurance. Narrow networks include a relatively limited set of cost-effective providers. When a payor creates a narrow network, it gives providers an incentive to offer competitive prices to participate in the plan in exchange for the added patient volume that being

included in the new network creates. Payors recruit cost-effective providers to participate in narrow networks precisely because they are willing to provide services at lower prices. Payors are sometimes also able to secure further discounts from providers in exchange for the incremental flow of patients that may result from being included in a narrow network. Narrow network plans can charge lower premiums to employers and patients than broad network plans because the payors are not paying as much to providers. Some employers will offer employees a choice between narrow and broad network plans, allowing the employee to pay the additional cost for the broad network plan if the employee values the additional provider options.

23.     **Tiered network plans** use broad networks but reward members with lower out-of-pocket expenses if they choose cost-effective providers within the network when they seek care. For example, a plan may charge members different co-insurance payments for different hospitals. Payors may assign a lower co-insurance payment to lower-cost hospitals to give members an incentive to use hospitals that offer better value. Members of tiered network plans can choose to secure healthcare from the lower-priced favored tier of providers or to pay more for care from the more expensive tier of providers.

24.     **Centers of excellence** give patients with broad network plans an incentive to seek specific healthcare services from designated groups of providers that offer better value within a broad network. When creating a center of excellence, payors identify specific high-quality, cost-effective programs—such as orthopedic surgery or oncology programs—at specific providers and encourage their members to choose care at those facilities by reducing or waiving the fees that the patient must pay. Members can then choose whether to seek care from the "center of excellence" providers that its plan has designated or to seek care from costlier providers at a higher price.

25.     **Site of service steering** is a plan feature that saves money by incentivizing patients to have procedures done in a lower-cost site of service—such as an ambulatory surgery center—instead of a higher cost site of service, such as a hospital.

26.     **Reference-based pricing** is a fixed reimbursement rate for a procedure (often pegged to some reference point like a market average price). The member has the option to seek care from any in-network provider, but the member will bear the additional costs associated with care that is obtained from a provider that charges more than this price.

27.     **Active transparency** is payor outreach to members to share pricing information that informs the member's choice of healthcare provider. For example, a payor may call a patient who has scheduled a magnetic resonance imaging ("MRI") procedure at a hospital and explain that the patient could save money by rescheduling the procedure at an outpatient facility where the payor has negotiated a better rate for the procedure. The patient can then choose where to get the MRI with the benefit of additional information about the cost to the patient.

28.     Not all patients may choose plans with these money-saving features, just as not all consumers choose lower-cost products at the grocery store. But the personal agency to make that choice as a consumer is the very essence of competition.

29.     Because these plan designs allow members to save money and obtain high-quality care by choosing cost-effective hospitals and other providers, they create price and quality competition among providers. As rival providers gain patient volume from participating in these plans, and as these plans gain members when patients are given the agency to choose among plans, more efficient rival providers obtain revenues to invest in quality improvements. Patients also experience good outcomes as they benefit from competition for quality, enabling rival providers to mitigate the reputational and informational barriers that dominant providers erect in

the marketplace. In short, the ability of payors to offer a variety of network plans and configurations generates a virtuous cycle of competition among providers.

30.     This, of course, is the essence of how competition benefits society. But OhioHealth impedes this competition by restricting payors from offering budget-conscious plan designs that would result in patients choosing rival hospitals and other providers instead of high-priced OhioHealth providers. OhioHealth's restrictions do not allow the essential features of competition to take hold in Columbus.

## OHIOHEALTH VIOLATES THE SHERMAN ACT AND THE VALENTINE ACT

### I.     OhioHealth's Contractual Restrictions Unlawfully Restrain Competition

31.     Payors must include OhioHealth in at least some of their plans to offer commercially viable health insurance in the Columbus area. OhioHealth has used its dominance to contractually restrict payors who want to include OhioHealth in any of their plans from offering budget-conscious plans, with the effect of protecting itself against price competition for healthcare services. These restrictions prevent rival hospitals or other providers from competing for more patient volume by lowering their rates. In so doing, the restrictions enable OhioHealth to continue to charge supracompetitive prices without the consequence of losing patient volume.

32.     Except for limited carve outs, OhioHealth restricts payors from offering budget-conscious plan designs that promote competition among healthcare providers by effectively forcing them to include OhioHealth in all networks for all commercial insurance products, regardless of how OhioHealth's prices compare to its competitors, and requiring that OhioHealth be featured at the most favored level of benefits in each network.

33.     OhioHealth's contractual restrictions effectively prevent the payors that account for at least 85% of commercial health insurance business in the Columbus area from introducing

10

budget-conscious plans. OhioHealth's restrictions inhibit the implementation of each and every one of the tools for creating budget-conscious plans described above.

34. OhioHealth's contractual provisions with payors also severely limit payors' efforts to increase transparency about the price of healthcare services in the Columbus area, thereby depriving patients of information they need to make good decisions. OhioHealth's contract provisions prevent payors from even providing patients with truthful information about the prices of healthcare services they may receive. These restrictions act effectively as gag rules. They prevent transparency by limiting the dissemination of price information or by setting other burdensome requirements on its disclosure. Patients, deprived of price information because of OhioHealth's restrictions, are deprived of their agency as purchasers of healthcare. They are unable to make price-conscious decisions, let alone shop around to consider obtaining healthcare services from OhioHealth's more cost-effective competitors.

35. These restrictions on budget-conscious plans and price transparency, in turn, deter OhioHealth's competitors from competing for patients by reducing prices or improving quality.

36. As a result of OhioHealth's anticompetitive conduct, patients and employers in the Columbus area likely pay more for healthcare and are less informed about the costs of healthcare than they would be if OhioHealth did not impose these contractual restrictions.

37. Payors that serve the Columbus area already offer budget-conscious plan designs in other parts of Ohio and in large parts of the United States. These payors want to provide these budget-conscious plans in the Columbus area but are restrained from doing so by OhioHealth's restrictions.

## II.    The Relevant Market and Anticompetitive Effects

### A.    Relevant Product Market

38.    Defining a relevant product market helps courts assess, among other things, the products or services for which a contract restrains trade. Although the contractual restrictions imposed by OhioHealth affect both inpatient services and OhioHealth's other healthcare services, the sale of inpatient general acute care ("GAC") hospital services to commercial payors and their members is a relevant product market in which to assess the market power that OhioHealth wields and the competitive effects of OhioHealth's contractual restrictions.

39.    Inpatient GAC hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual inpatient GAC hospital services are not substitutes for each other (*e.g.*, obstetrics is not a substitute for cardiac services), payors typically contract for the various individual inpatient GAC hospital services as a bundle, and the services are sold under similar competitive conditions, and OhioHealth's contractual restrictions have an adverse impact on the sale of all inpatient GAC hospital services. Therefore, inpatient GAC hospital services can be aggregated for analytical convenience.

40.    There are no reasonable substitutes or alternatives to inpatient GAC hospital services. Consequently, a hypothetical monopolist of inpatient GAC hospital services sold to payors would likely profitably impose a small but significant price increase or other worsening of terms for those services over a sustained period of time.

41.    Inpatient GAC hospital services do not include psychiatric care, substance abuse, rehabilitation services, pediatrics services, or outpatient services, as these services may be offered by a different set of competitors under different conditions from inpatient GAC hospital services and are not substitutes for inpatient GAC hospital services. The relevant market also

12

does not include sales of inpatient GAC hospital services to government payors, *e.g.*, Medicare (covering people age 65 and up or people with certain disabilities or medical conditions), Medicaid (covering low-income persons), and TRICARE (covering military personnel and families) because a healthcare provider's negotiations for commercial insurance plans are separate from the process used to determine the rates paid to providers by government payors. OhioHealth jointly negotiates inpatient GAC hospital services with all of the other services it offers in its contracts with payors, and its contract restrictions bind and impact competition for its full suite of service offerings.

        **B.**     **Relevant Geographic Market**

       42.     Defining relevant geographic markets helps courts assess, among other things, the market power wielded by OhioHealth and the anticompetitive impact of the challenged restraints. The area comprising Franklin and Delaware counties in Ohio is a relevant geographic market.

       43.     OhioHealth, in the ordinary course of its business, identifies Central Columbus as a distinct region for the delivery of healthcare services, and defines it as Franklin and Delaware counties. For example, a November 2024 Market Share Update prepared by OhioHealth shows the following map:

13

# OhioHealth's Markets



44.     For purposes of this Complaint, the area comprising Franklin and Delaware counties is called Central Columbus. Central Columbus contains most of the city of Columbus, Ohio. OhioHealth's flagship hospital is in the Central Columbus market, as are five other OhioHealth hospitals. Central Columbus is home to more than 1.5 million Ohioans who prefer to obtain care from hospitals located in Central Columbus. The following map shows the GAC hospitals located in and around Central Columbus.



45.     Central Columbus is a geographic market in which market power in the sale of

inpatient GAC hospital services can be exercised. It satisfies the hypothetical monopolist test. A

hypothetical monopolist consisting of all hospitals in Central Columbus likely would undertake

at least a small but significant increase in price or other worsening of terms over a sustained

period of time for at least one hospital. Patients in Central Columbus prefer to receive inpatient

GAC hospital services at hospitals that are close to their homes. Because of this, a payor without

any in-network hospitals located in Central Columbus would not be competitive selling

commercial health plans in Central Columbus. To continue selling commercial health insurance

15

to individuals and to employers in Central Columbus, payors would be forced to accept a price increase imposed by the hypothetical monopolist.

46.     The area not larger than the Columbus Metropolitan Statistical Area ("MSA"), as defined by the U.S. Office of Management and Budget, is also a relevant geographic market in which market power in the sale of inpatient GAC hospital services can be exercised. This market includes the counties of Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union. This Complaint refers to these 10 counties as the Columbus MSA. The following map shows the GAC hospitals in and around the Columbus MSA.



47.     A market of the Columbus MSA satisfies the hypothetical monopolist test. A hypothetical monopolist consisting of all hospitals in the Columbus MSA likely would undertake at least a small but significant increase in price or other worsening of terms over a sustained period of time for at least one hospital. Patients in the Columbus MSA prefer to receive inpatient GAC hospital services at hospitals that are close to their homes. Because of this, a payor without any in-network hospitals located in the Columbus MSA would not be competitive selling commercial health plans in the Columbus MSA. To continue selling health plans to individuals and to employers in the Columbus MSA, payors would be forced to accept a price increase imposed by the hypothetical monopolist.

### C.     Market Power and Anticompetitive Effects

48.     OhioHealth has market power in inpatient GAC hospital services in the relevant geographic markets. Other than OhioHealth, Ohio State and Mount Carmel are the only hospital systems that provide inpatient GAC services in Central Columbus. In the broader Columbus MSA, these three hospital systems control more than 85% of inpatient GAC discharges.

49.     In 2023, OhioHealth's share of inpatient GAC discharges was more than 35% in both the Central Columbus and Columbus MSA markets. Similarly, OhioHealth controls more than 35% of inpatient GAC hospital beds in the Columbus MSA market and the Central Columbus market. OhioHealth's market shares have been growing, and in 2023, an internal OhioHealth document reported "OhioHealth maintains strong market position" and "strong profitability." Market power confers the ability to raise prices above those that could be charged

in a competitive market, and OhioHealth's supracompetitive rates provide compelling evidence of its possession and exercise of market power.

50.     Because of OhioHealth's size and the many hospitals it controls, a payor selling health insurance plans to individuals and employers in the Columbus MSA and in Central Columbus must have OhioHealth as a participant in at least some of its provider networks to have viable health insurance products. OhioHealth also derives market power from its control of hospitals outside of the Columbus MSA, some of which are the only hospitals in their counties. Payors need those hospitals in their provider networks. This market power gives OhioHealth the ability to ward off competition by imposing restrictions in its contracts with payors that inhibit payors from offering budget-conscious plans.

51.     Payors that sell commercial health insurance plans in the relevant geographic markets have tried to negotiate the removal of these restrictions from their contracts with OhioHealth, but OhioHealth has summarily refused. Because of OhioHealth's market power, payors have had to agree to those restrictions. In the absence of these contractual restrictions, payors would be free to offer budget-conscious plans that allow patients to save money by choosing high quality and cost-effective hospitals, such as Ohio State or Mount Carmel. OhioHealth's contractual restrictions short circuit the competitive process and thereby lessen competition between OhioHealth and the other hospitals that provide inpatient GAC hospital services in the Columbus area, including Ohio State and Mount Carmel. Because of OhioHealth's contractual restrictions, OhioHealth's rivals are impeded in their efforts to win more commercially insured business by offering lower prices or higher value. The restrictions thus help insulate OhioHealth from competition and make it difficult for other hospitals to win market share from dominant OhioHealth. This failure of market forces, induced by OhioHealth's

18

contractual restrictions, harms the process by which OhioHealth and other Columbus-area hospitals would otherwise compete on the prices of the services they sell.

52.     OhioHealth's restrictions on budget-conscious plans further harm competition by hindering OhioHealth's rival hospitals from expanding and improving over time. Denied the ability to attract new patients via these plans, non-dominant rivals lose the opportunity to demonstrate what they offer to patients and to build their reputation and consumer loyalty. This in turn deprives them of the larger patient volume that could make new investments in services viable, further hurting patients and buttressing OhioHealth's ability to charge higher prices than it could if competition were not restricted.

53.     Because OhioHealth's contractual restrictions apply to all of the services it sells to payors, including inpatient GAC hospital services, outpatient services, physician services, and ancillary services such as labs and imaging, they impact competition across these services. In addition to hindering expansion by its rivals and preventing payors from featuring lower-cost providers, they create a barrier to entry by new providers of these services. Prospective entrants cannot, as in competitive markets, hope to attract patients by offering quality services at lower prices than the incumbents. This further harms consumers in the Columbus area.

54.     As a result of this reduced competition due to OhioHealth's contractual restrictions, individuals and employers in the Columbus area pay higher prices for health insurance coverage and have fewer insurance plans from which to choose. Deprived of price transparency and the ability to benefit from choosing more cost-effective providers, Columbus-area patients incur higher out-of-pocket costs for their healthcare.

55.     OhioHealth's restrictions on budget-conscious plans do not have any procompetitive effects. Any arguable benefits of OhioHealth's contractual restrictions are

outweighed by their actual and likely anticompetitive effects and/or could be achieved through less restrictive means. Without these restrictions, OhioHealth can seek to maintain its patient volume and market share by competing to offer lower prices, higher-quality, and better value than its competitors.

56.     Entry or expansion by other hospitals in the Columbus area has not counteracted the actual and likely competitive harms resulting from OhioHealth's restrictions on budget-conscious plans. And in the future, such entry or expansion is unlikely to counteract these harms to competition. Building a hospital with a strong reputation that can attract physicians and patients is difficult, time-consuming, and expensive. In fact, OhioHealth's restrictions raise barriers to entry for hospitals and other providers by making it virtually impossible for them to attract more patients by offering lower prices or more value.

## CLAIMS FOR RELIEF

### First Claim

### (Sherman Act, 15 U.S.C. § 1)

57.     Plaintiffs incorporate paragraphs 1 through 56 of this Complaint.

58.     OhioHealth has market power in the sale of inpatient GAC hospital services in the Columbus MSA and in Central Columbus.

59.     OhioHealth has and likely will continue to negotiate and enforce contracts containing restrictions on budget-conscious plans with commercial payors in the Columbus area. The contracts containing these restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

60.    OhioHealth's contractual restrictions on budget-conscious plans have had, and will likely continue to have, the following substantial anticompetitive effects in the relevant markets, among others:

    a.    protecting OhioHealth's market power and enabling OhioHealth to maintain at supracompetitive levels the prices of inpatient GAC hospital services;

    b.    substantially lessening competition among hospitals in their sale of inpatient GAC hospital services;

    c.    restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for inpatient GAC hospital services;

    d.    reducing patients' incentives to seek inpatient GAC hospital services from more cost-effective providers;

    e.    creating barriers to entry and expansion by rival providers of inpatient GAC hospital services; and

    f.    depriving payors and their members of the benefits of a competitive market for their purchase of inpatient GAC hospital services.

61.    The challenged restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## <u>Second Claim</u>

### (Valentine Act, Section 1331.04 of the Ohio Revised Code)

62.    The State of Ohio incorporates paragraphs 1 through 61 of this Complaint.

63.    Through the exercise of market power, OhioHealth has induced payors to agree to the contracts containing restrictions on budget-conscious plans, and it has exploited its market

dominance to maintain and preserve the restrictions and prevent payors from negotiating procompetitive contract terms.

64.     OhioHealth has thereby entered into combinations with payors for the purpose of creating and carrying out restrictions in trade or commerce, creating trusts under Section 1331(C)(1)(a) of the Ohio Revised Code, and each such combination, contract, or agreement in the form of a trust constitutes an illegal conspiracy against trade in violation of Section 1331.04 of the Ohio Revised Code.

## RELIEF REQUESTED

65.     WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and provide the following relief:

    a.    adjudge that all of the restrictions on budget-conscious plans in the contracts between OhioHealth and any commercial payors violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 1331.01(C)(1)(a) and 1331.04 of the Valentine Act;

    b.    enjoin OhioHealth, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts a payor from offering, or attempting to offer, plans that give members information and financial incentives to use any healthcare provider;

    c.    enjoin OhioHealth from substituting other unlawful and anticompetitive means of restricting budget-conscious benefit designs that would replicate the effects of its contractual restrictions;

22

    d.      enjoin OhioHealth from retaliating, or threatening to retaliate, against any insurer for offering, or attempting to offer, budget-conscious plans; and

    e.      award Plaintiffs their costs in this action and such other relief as the Court may deem just and proper.

Dated: February 20, 2026

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

OMEED A. ASSEFI
*Acting Assistant Attorney General*

NICOLE A. SARRINE
*Acting Deputy Assistant Attorney General*

DINA KALLAY
*Deputy Assistant Attorney General*

MIRIAM R. VISHIO
*Acting Director of Civil Enforcement
(Conduct and Operations)*

CATHERINE K. DICK
*Acting Director of Litigation*

JILL C. MAGUIRE
*Acting Chief, Healthcare and Consumer Products
Section*

GARRETT M. LISKEY
*Assistant Chief, Healthcare and Consumer
Products Section*

_____
Paul J. Torzilli* (S.D. Ohio Bar 4118832)
Senior Litigation Counsel

Karl D. Knutsen*
Rahul A. Darwar
Jessica Hollis
Stella Martin
Sean P. Mulloy
David M. Stoltzfus

Trial Attorneys

United States Department of Justice
Antitrust Division
Healthcare & Consumer Products Section
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 476-0547
Email: Paul.Torzilli@usdoj.gov

* Designated Trial Attorneys

FOR PLAINTIFF
STATE OF OHIO

DAVE YOST
Ohio Attorney General (OH Bar 0056290)

Beth A. Finnerty (OH Bar 0055383)
Section Chief, Antitrust Section
Edward J. Olszewski (OH Bar 0082655)
Assistant Section Chief, Antitrust Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Fax: (614) 995-0266

/s/ Thomas Collin
Thomas J. Collin (OH Bar 0023770)
Principal Assistant Attorney General
Antitrust Section
615 West Superior Avenue, 11th Floor
Cleveland, OH 44113
Telephone: (216) 787-4484
Fax: (866) 503-2011
Beth.Finnerty@OhioAGO.gov
Edward.Olszewski@OhioAGO.gov
Thomas.Collin@OhioAGO.gov