**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) | Case No.: 2:26-cv-207-ALM-SCS |
| | ) | |
| *Plaintiffs*, | ) | Judge Algenon L Marbley |
| | ) | |
| v. | ) | Magistrate Judge S. Courter Shimeall |
| | ) | |
| OHIOHEALTH CORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |

**DEFENDANT OHIOHEALTH CORPORATION'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)**

Under Fed. R. Civ. P. 12(b)(6), Defendant OhioHealth Corporation hereby moves to dismiss Plaintiffs' Complaint for failure to state a claim on which relief may be granted. The grounds for this motion are set forth in the accompanying memorandum in support.

Respectfully submitted,

*/s/ David M. DeVillers*
David M. DeVillers (0059456), Trial Attorney
Kristopher J. Armstrong (0077799)
BARNES & THORNBURG LLP
41 S. High St. Suite 3300
Columbus, Ohio 43215
Phone: (614)-628-0096
Fax: (614)-628-1433
David.DeVillers@btlaw.com
Kristopher.Armstrong@btlaw.com

Bradley R. Love (*pro hac vice*)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Phone: (317) 261-7896
Fax: (317) 231-7433
Bradley.Love@btlaw.com

*Attorneys for Defendant, OhioHealth
Corporation*

**S.D. OHIO CIV. R 7.2(A)(3)**
**TABLE OF CONTENTS AND SUMMARY**

I.       **INTRODUCTION** ...............................................................................1

II.     **FACTUAL BACKGROUND** ...........................................................3

    A. **The Healthcare Market** ...................................................................4

    B. **Government Regulation, Pricing Transparency Data, and Quality Ratings**.........4

    C. **The Geographic Market** ...................................................................6

    D. **Alleged Market Power**......................................................................7

    E. **Alleged Barriers to Entry** ................................................................7

    F. **Alleged Anticompetitive Conduct** ...................................................7

III.    **LEGAL STANDARD** ......................................................................9

To survive a motion to dismiss, a complaint must plead facts stating a facially plausible claim to relief; conclusory allegations are insufficient. The facts must go beyond showing mere possible liability to raise an inference of plausible liability.

    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................9, 10

    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................9, 10

    *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516 (6th Cir. 2008) .......................9

    Fed. R. Civ. P. 8(a)(2) .........................................................................................9

    Fed. R. Civ. P. 12(b)(6)......................................................................................10

IV.    **ARGUMENT** ................................................................................10

    A. **Motions to Dismiss Serve a Critical Gatekeeping Function in Antitrust Cases** ..10

*Twombly* raised the federal pleading standard for antitrust cases, determining that notice-pleading was insufficient, particularly in light of the enormous cost of antitrust discovery, which could push defendants to settle even anemic cases. Here, the governments' claims are generic; antitrust law demands more-specific pleading.

    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................10

    *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (*en banc*).......................10

    *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).11

    *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......11

    B. **Antitrust Law Protects the Freedom of Contract: Vertical Contracts Between Sophisticated Buyers and Sellers Are Presumptively Reasonable** ......................11

The Sherman Act does not restrict a private business's right to choose with whom it will deal. Courts should defer to voluntary contracts and should not use antitrust claims to second-guess business decisions. This *Colgate* doctrine is a foundational antitrust safe harbor. Negotiations between sophisticated parties promote competition

ii

and lowers prices. Voluntarily, competitively-bid vertical contracts rarely violate Section 1. Vertical contracts between buyers and sellers are *per se* legal.

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...................................................................................................................11

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) .........................................11

*Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336 (6th Cir. 2006).............11

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000) ..12

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005) ...................................................................................................................12

*Dunn & Mavis, Inc. v. Nu–Car Driveaway*, Inc., 691 F.2d 241 (6th Cir. 1982)...12

**1.    OhioHealth Competed with Other Hospitals and Providers to Win Business from Insurers During Contract Negotiations.................................................12**

Due to healthcare's complexity, consumers use insurance companies to negotiate lower pricing; insurance companies do so through collective negotiations. In Columbus, OhioHealth competes with two other hospital systems for patient volume through negotiations with insurers. Antitrust law protects, rather than proscribes, this "competition for the contract," which occurs regularly when contracts expire and are re-bid, lowers prices and benefits consumers. Even contracts that entirely exclude other hospitals from some insurance plans do not violate Section 1; *ipso facto*, the less restrictive contracts at issue in this case also do not violate Section 1. The complaint contains no facts that contradict the presumed reasonableness of freely negotiated contract terms.

*Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) . 13

*Methodist Health Servs. Corp. v. OSF Healthcare System*, 859 F.3d 408 (7th Cir. 2017) ....................................................................................................... 13, 14

*Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804 (E.D. Ky. 1999)......................................................................................14

**2.    OhioHealth Has No Obligation to Help Its Competitors..............................15**

The antitrust laws protect competition, not competitors. Yet, the "harm" alleged in the complaint is that OhioHealth did not help its competitors take business from OhioHealth. The complaint asserts, via unsupported conclusory allegations, the discredited "essential facilities" doctrine. The Sherman Act does not compel OhioHealth to help its competitors by being less competitive.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...................15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).......................................15

*CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, 619 F. Supp. 3d 983 (C.D. Cal. 2022) ....................................................................................................................16

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..................................................................................................... 15, 16

*Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) ..................................................................................................... 16, 17

**C. The Complaint Fails to Allege Anticompetitive Vertical Restraints...................17**

Antitrust law places few restrictions on vertical agreements. To prove a vertical-restraint case, a plaintiff must show the defendant contracted, combined, or conspired; with anticompetitive effects; within relevant product and geographic markets; that the object of and conduct resulting from the contract were illegal; and that the contract proximately caused injury to the plaintiff.

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ..........................................17

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ...............................17

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005) ..................................................................................................................18

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir. 1989) ........18

**1. The Complaint Does Not Allege Any Conspiracy...........................................18**

The complaint fails to allege the "who, what, where, when, how [and] why" of a conspiracy.

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008).............................................................................................18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................18

**2. The Complaint Alleges Harm to Competitors Not Harm to Competition.....18**

The complaint alleges OhioHealth used bargained-for preference in contracts with insurers, *i.e.*, that it won favorable contracts from insurance companies with better prices, better service, more service options, better locations, better providers, better marketing, and the like. This is free-market competition, which the antitrust laws fiercely protect. At most, the complaint alleges harm to OhioHealth's competitors, which is not actionable under antitrust law.

*Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336 (6th Cir. 2006).............19

*Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802 (6th Cir. 1988) 19

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .................................................................................................................20

**3. The Complaint Does Not Allege Plausible Harm in Relevant Markets .........20**

**i. The Complaint Fails to Allege a Geographic Market...............................20**

Dismissal of a claim is appropriate where there is an insufficiently pled or totally unsupportable proposed market, and the Complaint fails to sufficiently plead the relevant geographic market.

*Michigan Div.-Monument Builders of N. Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008)..................................................................................20

*Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) ....................................................................................................................21

John J. Miles, 2 Health Care and Antitrust L. § 15:11...........................................21

**ii.  The Complaint Does Not Allege Market Power Based on OhioHealth's Market Share......................................................................................21**

The complaint's allegations are flatly inconsistent with claims of harm to competition in the Columbus region: three hospital systems, with OhioHealth having about a third of the market. Courts consistently reject claims of market power based on market shares below 50 percent.

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945)...................22

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)...............................22

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 (1953)................22

**iii. The Complaint Lacks Allegations The OhioHealth Demonstrated Market Power ..................................................................................................22**

The Complaint's vague allegations that OhioHealth was strongly profitable or charged higher prices are insufficient to establish market power.

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ..........................................23

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .............................................................................................................................23

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, (7th Cir. 1995) .......................................................................................................23

*Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994 (S.D. Ohio 2016) ......................24

*Ennenga v. Starns*, 677 F.3d 766 (7th Cir.2012)................................................24

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014) ...........................24

**4.  The Complaint Does Not Allege Illegal Agreements....................................25**

The Complaint fails to allege any recognizably anticompetitive vertical restrictions. Plaintiffs allege nothing more than purported antisteering agreements, which are not inherently anticompetitive.

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005) .............................................................................................................................25

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ...................................25, 26

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)........26

*Methodist Health Servs. Corp. v. OSF Healthcare System*, 859 F.3d 408 (7th Cir. 2017) ......................................................................................................................26

*Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) .............................................................................................................................26

**D. The State Antitrust Claims Fail for the Same Reasons as the Federal Antitrust Claims**............................................................................................................27

Courts evaluate Ohio's Valentine Act using the same standards they apply to the Sherman Act. Plaintiffs' state-law claims fail for the same reasons as their federal claims.

*Johnson v. Microsoft Corp.*, 2005-Ohio-4985, 106 Ohio St. 3d 278, 834 N.E.2d 791 (2005) ........................................................................................................27

*C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St.2d 201, 17 O.O.3d 124, 407 N.E.2d 507 (1980) ............................................................................27

**V.    CONCLUSION** ....................................................................................................**27**

**MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

OhioHealth Corporation is a nationally recognized, not-for-profit, charitable, healthcare outreach of the United Methodist Church, which has been serving patients in its communities since 1891. OhioHealth's hospitals and physicians are connected by the system's mission to improve the health of those it serves, its core values of compassion, excellence, stewardship, integrity, and inclusion, and its cardinal value of honoring the dignity and worth of each person.  OhioHealth is dedicated to serving communities through its Community Benefit, which totaled over $493 million in its fiscal year 2025, including charity care for people who lack insurance or the means to pay for care, Medicaid costs not reimbursed by the state or federal government, and investments in improving access to health services, enhancing the health of its communities, advancing health and medical knowledge, supporting sustainable practices, and committing to corporate responsibility. OhioHealth is transparent about the cost of its services, including providing out-of-pocket cost estimates for over 882 different services on its website available to the public.

OhioHealth is committed to providing the expert treatment its patients need, close to where they live and work so that not only can those patients return to their lives sooner, but they also can benefit from improved outcomes. OhioHealth facilities carry accreditations from third-parties in stroke treatment, cancer services, trauma care, bone marrow transplants, cardiovascular treatments, imaging, and medical education, among others. According to the government's own published Centers for Medicare & Medicaid Services ("CMS") data, OhioHealth's Riverside Methodist Hospital is the only overall five-star rated hospital in Columbus, Ohio. *See* USA Today, Hospital CMS Ratings (available at: https://data.usatoday.com/hospital-ratings/?query=columbus%2C+oh) (accessed 4/16/2026). The United States and the State of Ohio's ("the governments") allegations

1

to the contrary stem from a misplaced reliance on Leapfrog scores that are based on deceptive and unfair trade practices. *See Good Samaritan Medical Center, Inc. v. Leapfrog Group*, No. 9:25-cv-80526-DMM (S.D. Fla. Mar. 6, 2026) (finding, in order following bench trial, that Leapfrog assigned "arbitrarily low scores" to hospitals that did not participate in its survey, "rendering it almost impossible for these hospitals to receive a passing grade"; holding that Leapfrog's methodology "has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety"; and ordering Leapfrog to cease using its methodology and to "withdraw" the "deceptive and unfair Safety Grades" from its websites), *appeal docketed*, No. 26-11527 (11th Cir. Apr. 30, 2026) (attached hereto as Exhibit A).[1]

The governments claim that OhioHealth illegally limited healthcare competition in the Columbus area, yet the Complaint describes the opposite. The Complaint describes fierce competition where there are winners and losers. The governments appear to seek less-vigorous competition or what the governments would consider the "right" outcome from competition: OhioHealth would not seek to beat its competitors in the marketplace and win more business but instead would *help* its *competitors* get more business. That is the opposite of competition, and it is not a recognized antitrust claim.

Even ignoring this obvious flaw—bringing antitrust claims to dampen competition—the Complaint fails on its own terms. The Complaint alleges that some insurance companies offering health insurance in the Columbus area do not offer certain types of health insurance plans the governments would prefer—so-called "budget-conscious plans." The Complaint blames the insurance companies' decisions to not offer more "budget-conscious plans" on alleged agreements

---

[1] Leapfrog has removed its "grades" for OhioHealth's hospitals from its website. *See*, https://ratings.leapfroggroup.org/search/results?facility=OhioHealth&sort=relevance&by=facility (and toggle "No" to "Yes") (accessed 5/7/2026).

2

the insurance companies entered with OhioHealth, but the Complaint fails to allege any details about the purported agreements. The Complaint does not identify any of the parties involved besides OhioHealth. It does not allege when the agreements were entered, how long they lasted, or any other specifics. OhioHealth and the Court are left to guess the who, when, where, what, and how of the alleged anticompetitive agreements. The bare claim that anticompetitive agreements must exist because insurance companies have offered some types of "budget-conscious plans" elsewhere but did not in Columbus does not meet the pleading requirements for antitrust claims.

What the Complaint does allege disproves antitrust liability. The Complaint alleges that OhioHealth has only a 35% share of the claimed relevant markets, which does not suggest the necessary market power for such antitrust claims. And the Complaint lacks any allegation of exclusionary agreements; instead, it alleges only antisteering restrictions—restrictions the Supreme Court found were not anticompetitive but enhance competition, stem negative externalities, and prevent free riding. *Ohio v. American Express Co.*, 585 U.S. 529, 551 (2018) ("[T]here is nothing inherently anticompetitive about Amex's antisteering provisions."). There is no basis for the litigation to proceed.

## II.     FACTUAL BACKGROUND[2]

The governments filed their Complaint alleging that OhioHealth violated Section 1 of the Sherman Act and the equivalent provision of Ohio's Valentine Act on February 20, 2026. Complaint, ECF No. 1 ("Complaint"). The governments claim that OhioHealth used market power to somehow prevent insurance companies from offering certain types of health insurance plans in

---

[2] In describing or referring to the allegations contained within the governments' Complaint, OhioHealth accepts any well-pleaded facts—as opposed to legal assertions—to be true for purposes of this motion. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). By describing such allegations herein, OhioHealth does not admit the truth of any such allegations.

the Columbus area and that this "is effectively preventing competitors from achieving scale with regard to patients as well as quality." Complaint at ¶ 2, PageID 2.

### A. The Healthcare Market

According to the Complaint, hospital networks must "[b]uild[] a hospital with a strong reputation that can attract physicians and patients[, which] is difficult, time-consuming, and expensive." Complaint at ¶ 56, PageID 20. OhioHealth operates "hospitals, outpatient facilities, physician groups, and other healthcare services throughout Ohio." *Id.* at ¶ 7, PageID 3. OhioHealth competes for physicians, patients, and insurance-company business with at least The Ohio State University Wexner Medical Center and Mount Carmel Health System in the Columbus area. *Id.* at ¶ 8, PageID 3.

Given the complexities of healthcare, consumers enter contracts with insurance companies to negotiate lower pricing, better service, and better contract terms jointly on their behalf. Complaint at ¶ 17, PageID 6. While some individuals purchase healthcare outside of insurance companies or government plans, insurance companies get better pricing and terms due to their bargaining power and negotiations with medical providers and hospital systems. *Id.*

The Complaint alleges that "the sale of inpatient general acute care ('GAC') hospital services" to insurance companies in the Columbus area constitutes the relevant product market. Complaint at ¶ 38, PageID 12.

### B. Government Regulation, Pricing Transparency Data, and Quality Ratings

The governments exercise substantial regulatory authority over healthcare and hospital services. As part of the Affordable Care Act, the Hospital Price Transparency Rule became effective January 1, 2021, and the rule requires every hospital operating in the United States to establish, update, and make public: (1) a machine-readable file containing a list of all standard charges for all items and services, and (2) a consumer-friendly list of standard charges for a limited

4

set of shoppable services. 45 C.F.R. Part 180. For each shoppable service, the hospital must disclose: (1) the payer-specific negotiated charges; (2) the discounted cash price; (3) the de-identified minimum negotiated charge; and (4) the de-identified maximum negotiated charge. 45 C.F.R. § 180.60.

OhioHealth complies with the governments' price transparency regulations. OhioHealth provides pricing for all services at each of its hospitals, including reimbursement rates for each contracted payor, on its website in the form of machine-readable files. In addition, OhioHealth provides out-of-pocket cost estimates for over 882 common hospital-based services on its website available to the public.

The federal government—through CMS—collects and publishes detailed quality of care assessments for medical providers, including hospitals. Complaint at ¶ 10, PageID 4. The Complaint does not allege how OhioHealth's CMS Star Rating compares to competing hospitals in Columbus, Ohio, but the government publishes its data in regular reports for patients to use in comparing healthcare providers. According to government data, OhioHealth's Riverside Methodist Hospital is the only overall five-star rated hospital in Columbus, Ohio.



*See* USA Today, Hospital CMS Ratings (available at: https://data.usatoday.com/hospital-ratings/?query=columbus%2C+oh) (accessed 4/16/2026).

## C. The Geographic Market

The Complaint alleges that the relevant geographic market for patients obtaining healthcare services is either comprised of "Franklin and Delaware counties" or "Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union" counties. Complaint at ¶ 42-46, PageID 13-16. The Complaint also claims that unspecified "rural hospitals"—presumably outside of the counties identified as part of the alleged geographic market—give OhioHealth

6

market power. *Id.* at ¶ 11, PageID 4-5. The Complaint does not explain how an appropriate market definition would include these rural hospitals or allege any facts regarding the competitive landscape in the larger geographic market that includes these rural hospitals.

### D. Alleged Market Power

The Complaint alleges that OhioHealth has a market share of 35% as measured by hospital beds and inpatient GAC hospital discharges. Complaint at ¶ 49, PageID 17-18. The Complaint alleges that because of OhioHealth's market share, insurance companies "must have OhioHealth as a participant in at least some of [their] provider networks to have viable health insurance products." *Id.* at ¶ 50, PageID 18.

### E. Alleged Barriers to Entry

The Complaint suggests that reputation and network effects constitute barriers to entry. "Building a hospital with a strong reputation that can attract physicians and patients is difficult, time-consuming, and expensive." Complaint at ¶ 56, PageID 20.

### F. Alleged Anticompetitive Conduct

Without actually identifying any specific carve outs or their limitations, the Complaint alleges that "[e]xcept for limited carve outs, OhioHealth restricts [insurance companies] from offering budget-conscious plan designs that promote competition among healthcare providers by effectively forcing them to include OhioHealth in all networks for all commercial insurance products … and requiring that OhioHealth be featured at the most favored level of benefits in each network." Complaint at ¶ 32, PageID 10. Further, it alleges that OhioHealth entered agreements with insurance companies that "prevent transparency by limiting the dissemination of price information or by setting other burdensome requirements on its disclosure." *Id.* at ¶ 34, PageID 11.

In each instance, the purported harm from the alleged agreements is that they "deter OhioHealth's competitors from competing for patients …." Complaint at ¶ 35, PageID 11. The Complaint alleges that:

(1) "OhioHealth is effectively preventing competitors from achieving scale with regard to patients as well as quality", *id.* at ¶ 2, PageID 2;

(2) other hospitals cannot "compete for additional patients", *id.* at ¶ 5, PageID 2-3;

(3) "rival hospitals or other providers [cannot] compet[e] for more patient volume", *id.* at ¶ 31, PageID 10;

(4) "OhioHealth's rivals are impeded in their efforts to win more commercially insured business", *id.* at ¶ 51, PageID 18-19;

(5) the alleged agreements "hinder[] OhioHealth's rival hospitals from expanding and improving over time", *id.* at ¶ 52, PageID 19;

(6) "rivals lose the opportunity to demonstrate what they offer to patients and to build their reputation and consumer loyalty", *id.* at ¶ 52, PageID 19;

(7) the alleged agreement "deprives [rival hospitals] of the larger patient volume that could make new investments in services viable", *id.* at ¶ 52, PageID 19; and

(8) the alleged agreements are "hindering expansion by its rivals", *id.* at ¶ 53, PageID 19.

The Complaint does not allege when OhioHealth entered the alleged agreements. The Complaint does not allege who entered the alleged agreements with OhioHealth. The Complaint does not allege how long the agreements lasted. The Complaint does not allege that the alleged agreements cannot be terminated or renegotiated. The Complaint does not allege that any insurance company that allegedly entered an agreement with OhioHealth attempted to introduce a new insurance plan and was prevented from doing so.

8

The Complaint does not even allege that the purported agreements specifically prohibit any budget-conscious plan or transparency effort. The Complaint admits that the unspecified restrictions have equally unspecified "carve outs" and that they contain no absolute requirement "to include OhioHealth in all networks for all commercial insurance products" Complaint at ¶ 32, PageID 10. Regarding transparency, the Complaint alleges only that unspecified restrictions "limit payors' efforts to increase transparency about the price of healthcare services." *Id.* at ¶ 34, PageID 11.

### III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Conclusory allegations need not be accepted as true and should be disregarded for purposes of a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (requiring a court to disregard allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth"); *Twombly*, 550 U.S. at 555–57. Rather, the "complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).

Federal Rule of Civil Procedure Rule 8(a)(2) requires a plaintiff to make a showing of his entitlement to relief. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (citations omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*,

9

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). A complaint survives a Rule 12(b)(6) challenge only if its well-pleaded factual allegations are sufficient to state a claim for relief that is plausible on its face. *Id.* at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## IV.    ARGUMENT

### A. Motions to Dismiss Serve a Critical Gatekeeping Function in Antitrust Cases.

The Supreme Court's decision in *Twombly* significantly raised the federal pleading standard in antitrust cases, determining that the notice-pleading standard was insufficient to protect defendants from the burdens arising from baseless allegations of purported antitrust violations. 550 U.S. at 557-560. In doing so, the Supreme Court explicitly acknowledged the enormous cost of antitrust discovery, observing that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive" *Id.* at 558. The Supreme Court cautioned that without adequate pleading scrutiny, "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases." *Id.* For this reason, "[f]ederal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (*en banc*).

The governments seek to use generic claims of harm from unspecified terms in one hospital system's contracts with unidentified insurance companies to justify a massive antitrust case. Antitrust law rightly demands more specific factual allegations before subjecting a defendant to the enormous expense of antitrust litigation.

Similar allegations of unspecified harm could be levied against most businesses based on the terms of contracts they enter, but courts correctly use the gatekeeping function of motions to dismiss to protect defendants from the chilling effects of such claims on legitimate, free-market competition. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) ("Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)) (affirming dismissal of antitrust claims based on refusal of phone company to assist rivals).

### B. Antitrust Law Protects the Freedom of Contract: Vertical Contracts Between Sophisticated Buyers and Sellers Are Presumptively Reasonable.

As the Supreme Court has confirmed for more than 100 years, "the Sherman Act 'does not restrict the long[-]recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 407-408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)) (affirming dismissal of antitrust claim).

The Sixth Circuit explained the need for courts to defer to voluntary contracts and not use antitrust claims to second-guess business decisions in *Expert Masonry, Inc. v. Boone County*:

> Moreover, there is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude in selecting the entity from whom it will purchase products or services. Far from being anticompetitive, it is the appropriate nature of a functioning competitive marketplace that buyers are free to choose from whom they will buy, sellers are free to choose to whom they will sell, and salesmen battle and strive to curry favor and close the deal; whether the parties exercise wise business judgment in any given transaction is not a concern of the antitrust laws.

*Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 347 (6th Cir. 2006).

The *Colgate* doctrine is the foundational antitrust safe harbor protecting a company's right to exercise independent, unilateral discretion in deciding with whom it will do business and on

11

what terms. *Colgate* is antitrust law's long-recognized endorsement of the free-market system. Antitrust law does not force a company to sell to everyone, to help its competitors, or to accept terms of contract that it believes are burdensome, unfit, or unprofitable.[3]

Antitrust law thus comports with common sense. Negotiations between sophisticated buyers and sellers promote competition and lower prices. Accordingly, voluntary, competitively-bid vertical contracts rarely violate Section 1 of the Sherman Act. *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000) (rejecting claims that "voluntary contracts" for engines were anticompetitive under Section 1 because "[n]obody forced the boatmakers individually to accept [it]" rather "they individually got a deal [discounts] from it").

Horizontal agreements—or agreements between competitors—face stricter scrutiny under the antitrust laws due to their potential to harm competition. Vertical agreements between buyers and sellers, on the other hand, pose much less concern. They are "*per se* legal, because a 'manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself.'" *Care Heating & Cooling, Inc. v. Am. Standard, Inc.,* 427 F.3d 1008, 1013 (6th Cir. 2005) (quoting *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir. 1982)) (affirming dismissal of Section 1 claims).

### 1. OhioHealth Competed with Other Hospitals and Providers to Win Business from Insurers During Contract Negotiations.

Given the complexities of healthcare, consumers use insurance companies to negotiate lower pricing, better service, and better contract terms. Through collective negotiations on behalf of large groups of consumers, insurance companies get better pricing. In the Columbus area,

---

[3] As the governments will likely argue, *Colgate*—by its express terms—does not immunize a company from liability for restrictions in a contract with another party; however, the Complaint fails to identify *any* specific contractual provisions in *any* contract OhioHealth has entered that unreasonably restrict competition. Instead, the governments rely on broad, vague pronouncements of OhioHealth's policies or positions. OhioHealth's choices of what health insurance plans to participate in are subject to the *Colgate* safe harbor.

OhioHealth competes with at least two other hospital systems for patient volume through contract negotiations with insurance companies. Complaint at ¶ 43-48, PageID 13-17.

Hospitals' competition for contracts with insurance companies to obtain enough patient volume to support their business is what courts have identified as "competition-for-the-contract." As the Seventh Circuit explained, "competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common." *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (affirming dismissal of Section 1 claims alleging contractual restrictions by larger papers made it "harder for small papers to grow").

This competition, occurring regularly when contracts are terminated, re-bid, or expire, lowers prices and benefits consumers. "Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run, and competition of this kind drives down the price [], to the ultimate benefit of consumers." *Paddock Publications*, 103 F.3d at 45. Competition between hospitals at the contract stage benefits rather than harms competition because "competition for the contract makes it possible to have the benefits of exclusivity and rivalry simultaneously." *Id.* at 47 (finding that ability to re-negotiate or terminate contracts precluded Section 1 claim).

Judge Posner explained these straightforward dynamics of hospital system-insurance company contracting for the Seventh Circuit Court of Appeals in *Methodist Health Servs. Corp. v. OSF Healthcare System*, 859 F.3d 408 (7th Cir. 2017).

> And an insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract, as exclusivity will drive a higher volume of business to the hospital. The contracts made by [the defendant] are of fixed rather than indefinite, let alone perpetual, duration; and when they terminate, the insurance companies are free to strike deals with other hospitals…. If [another hospital system] can't outbid [the defendant]—if a health insurance company prefers to contract with [the defendant], the logical inference is that [the defendant] offered the health insurer a better deal,

13

> doubtless based on its offering a broader and deeper range of services than [another hospital system] does.

*Methodist Health Servs. Corp.*, 859 F.3d at 410-411 (rejecting Section 1 claims).

If contracts entirely excluding other hospitals from some insurance plans do not violate Section 1, *ipso facto* contracts that only sometimes require that OhioHealth be included in an insurance plan and "featured at the most favored level of benefits" cannot constitute a Section 1 violation. Complaint at ¶ 31, PageID 10.

The Complaint contains no allegations to refute the presumed reasonableness of freely negotiated contract terms agreed to by insurance companies in the presence of competing offers from the other hospitals. The governments do not allege that the insurance companies contracting with OhioHealth failed to obtain lower prices for themselves and their customers through their negotiations. Rather, the result of the negotiations is exactly what antitrust laws intended: lower prices on terms that benefit both parties to the alleged agreements.

To use the governments' own grocery-store analogy, OhioHealth negotiated with insurance companies—the "grocery stores" that present healthcare services to their customers—for favorable treatment. *Cf.* Complaint at ¶ 19, PageID 6-7. In those negotiations, OhioHealth offered discounts and lower prices in exchange for premium shelf space in the store—*i.e.,* being the featured hospital or being on equivalent terms with other featured hospitals. Just like Kellogg's can bargain for Frosted Flakes to be prominently displayed on the cereal aisle, OhioHealth can bargain for high-tier status with insurance companies. *E.g. Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804, 815 (E.D. Ky. 1999) ("[T]his Court has no business in engaging in 'affirmative action' among retail outlets by telling retailers to give Coke and Pepsi equal retail space. The Court would be protecting a competitor rather than competition if it were to do so.") (citations omitted).

14

Through antitrust claims, the governments seek to deprive OhioHealth and the unidentified insurance companies of the benefits of their bargain—lower prices for insurers and consumers and the opportunity for greater patient volume for OhioHealth. Even where the pro-competitive benefits of competitive negotiations are not as clear, courts should hesitate to second-guess the business decisions of sophisticated parties negotiating complex agreements in specialized markets. Asking courts to intervene in private contracts negotiated regularly in competitive markets—especially with the vague reasonableness and cost-benefit assessments of antitrust law—is more likely to reduce competition and hurt consumers than it is to benefit either.

## 2. OhioHealth Has No Obligation to Help Its Competitors.

"The antitrust laws … were enacted for 'the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis original). The Complaint alleges that the purported "harm" from the contracts OhioHealth negotiated with insurance companies is that OhioHealth did not assist competing hospital systems and allow them to better compete and take business from OhioHealth. *See supra* at 8.

Even if the Complaint alleged that OhioHealth was a monopolist in a properly-defined market—which it does not—OhioHealth would be permitted to choose its customers and set the terms of those sales. As the Supreme Court explained in *Trinko*, "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers" and "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407-408. "Enforced sharing also requires antitrust courts to act as central planners, identifying the proper

15

price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408. Antitrust law does not mandate specific contract terms.

Here, the Complaint alleges that OhioHealth invested in the "difficult, time-consuming, and expensive" task of "[b]uilding a hospital with a strong reputation that can attract physicians and patients" and was rewarded with demand from patients in Columbus. Complaint at ¶ 56, PageID 20. After OhioHealth made those difficult investments and built a strong reputation, the governments assert that OhioHealth should not be permitted to use those hard-won advantages to compete in the marketplace. Instead, OhioHealth must artificially restrain itself and help its competitors obtain the necessary patient volume to grow and succeed.

In essence, the Complaint asserts claims based on the discredited "essential facilities" doctrine through creative pleading under Section 1 of the Sherman Act.[4] The crux of the Complaint—and the basis for all the claimed anticompetitive effects—is the unsupported legal conclusion that insurance companies "must include OhioHealth in at least some of their plans to offer commercially viable health insurance in the Columbus area." Complaint at ¶ 31, PageID 10. While the Court need not credit this bare assertion, insurance companies' or consumers' desire to have access to OhioHealth's medical facilities, providers, or services does not give rise to an antitrust claim. "This is fundamentally an 'essential facilities' claim-but without any essential facility." *Paddock Publications*, 103 F.3d at 44 (affirming dismissal of Section 1 claim).

For the same reasons set forth in *Paddock Publications*, the Complaint's antitrust claim seeking to force OhioHealth to help its competitors better compete should be dismissed. As in *Paddock Publications*, the Complaint alleges "three [hospital systems] that … [are] major

---

[4] Some lower courts have recognized the "essential facilities" doctrine, which requires a firm with monopoly power over a critical input to sell that input to its competitors, as a narrow exception to the rule that a business has no obligation to "provide free aid and assistance to its competitor." *CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, 619 F. Supp. 3d 983, 990 (C.D. Cal. 2022). The Supreme Court refused to endorse the doctrine in *Trinko*. 540 U.S. at 411.

16

competitors…." *Id.* Further, "this case does not involve a single facility that monopolizes one level of production and creates a potential to extend the monopoly to others." *Id.* at 45. In the case of OhioHealth, the governments have not even identified the supposed essential facility. At least in *Paddock Publications*, the complaint identified supplemental subscription news as the purported essential facility. The Complaint in this case alleges only that some insurance companies believe they "must include OhioHealth in at least some of their plans to offer commercially viable health insurance in the Columbus area" without giving any reason why. Complaint at ¶ 31, PageID 10.

The Supreme Court in *Trinko* appropriately cut off plaintiffs' ability to bring antitrust claims to compel defendants to help their competitors. *Trinko*, 540 U.S. at 410 (holding "alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim"). In doing so, the Supreme Court cast doubt on the viability of *any* claims based on failure to assist rivals. *Id.* at 411 ("We have never recognized [the essential facilities doctrine] … and we find no need either to recognize it or to repudiate it here." (citations omitted)). Allegations that provisions in OhioHealth's contracts with unspecified insurance companies do not do enough to assist competing providers to take business from OhioHealth are not a recognized antitrust claim.

### C. The Complaint Fails to Allege Anticompetitive Vertical Restraints.

Antitrust law imposes few restrictions on parties' freedom of contract in vertical agreements. *See Ohio v. American Express Co.*, 585 U.S. 529, 543 n.7 (2018) (noting "vertical restraints often pose no risk to competition unless the entity imposing them has market power"); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 (1977) ("Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products.").

A vertical restraint case "requires the plaintiff to prove (1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) within

17

relevant product and geographic markets; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiff's injury." *Care Heating & Cooling*, 427 F.3d at 1014 (citing *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)). Since the governments do not bring claims based on their own healthcare purchases, the proximate cause requirement (5) is not relevant here. The governments have not met the other requirements to plead a violation of Section 1 of the Sherman Act.

### 1. The Complaint Does Not Allege Any Conspiracy.

To adequately plead an agreement or conspiracy under Section 1, plaintiffs must allege "the who, what, where, when, how [and] why." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (citing *Twombly*, 550 U.S. at 564, n. 10). Failure to allege who entered the agreements, "where and how this was accomplished," or "where or when … any unlawful agreements or understandings might have occurred" requires dismissal. *Id.* at 436 (affirming dismissal of Section 1 rule-of-reason claims based on failure to meet "the required pleading threshold").

The Complaint does not allege who conspired with OhioHealth, when any agreements started or ended, where they took place, how long they lasted, or what specific terms in any agreement restrained competition. The Complaint lacks sufficient factual allegations to permit the Court to assess whether the conspiracy alleged is plausible. "[T]he vague allegations in the instant case 'do not supply facts adequate to show illegality' as required by *Twombly*." *Id.* at 437

### 2. The Complaint Alleges Harm to Competitors Not Harm to Competition.

As discussed above, the gravamen of the governments' claims is that OhioHealth has allegedly used bargained-for preference in contracts with insurance companies to obtain more patients and "hinder[] OhioHealth's rival hospitals from expanding and improving over time." Complaint at ¶ 52, PageID 19. Because OhioHealth won favorable contracts from insurance

18

companies with better prices, better service, more service options, better locations, better providers, better marketing, or any of the multitude of reasons an insurance company might prefer OhioHealth over rivals, the governments allege that "rivals lose the opportunity to demonstrate what they offer to patients and to build their reputation and consumer loyalty" and "the larger patient volume that could make new investments in services viable." *Id.*

But free-market competition—especially in markets where buyers combine their purchasing power to jointly purchase through insurance companies to get better prices—results in winners and losers. Every company losing a big contract or getting less-favorable terms than it wanted loses business volume that would have permitted the company to "expand and improve," "demonstrate what they offer," "build their reputation and consumer loyalty," and "make new investments." *Id.* Such allegations *prove competition*; they do not show any harm to it.

As the Sixth Circuit held in *Expert Masonry*:

> To allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition and salesmanship, for companies and their staffs could not reasonably be expected to compete to win sales, projects, and new clients if, in so doing, they risk treble damages and even imprisonment when even one rival is disappointed with the results. For the courts to entertain such antitrust cases would require the courts themselves to substitute their own business judgment for that of the companies involved, but, as we have previously noted, "[c]ourts have no expertise to make such [business] judgments, and certainly antitrust liability cannot be premised on improvident business decisions."

*Expert Masonry*, 440 F.3d at 347-48 (quoting *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 809 (6th Cir. 1988)).

At best, the Complaint alleges harm to OhioHealth's competitors. Harm to competitors through competitive negotiations, bidding, and contracting *constitutes* competition. The antitrust laws protect fierce competition; the concern would be if OhioHealth were conspiring with competitors to help them rather than trying to take their business. While not alleged here, "[e]ven

19

an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).

### 3. The Complaint Does Not Allege Plausible Harm in Relevant Markets.

#### i. The Complaint Failes to Allege a Geographic Market.

Although market definition is fact based, dismissal of a claim is appropriate where there is an "insufficiently pled or totally unsupportable proposed market." *Michigan Div.-Monument Builders of N. Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) (affirming dismissal because geographic market definition was deficient "as a matter of law"). The Complaint fails to sufficiently plead the relevant geographic market. The Complaint alleges two geographic markets: (1) "Central Columbus" consisting of Delaware and Franklin counties, and (2) the "Columbus Metropolitan Statistical Area ("MSA")." Complaint at ¶ 42 and ¶ 46, PageID 13, 16. The governments apparently base these regions on two maps characterized as ordinary course documents that describe distinct areas for the "delivery of healthcare services." Complaint at ¶ 43, PageID 13-14.

According to the Complaint, OhioHealth's purported market power in the alleged markets derives in some way from OhioHealth's rural hospitals located outside of the alleged markets. Complaint at ¶ 50, PageID 18. The governments claim that OhioHealth forces insurance companies that want to contract with OhioHealth's rural hospitals outside the alleged geographic markets to also include OhioHealth's non-rural hospitals within the relevant geographic markets. *Id.* The Complaint lacks any plausible explanation of how its alleged relevant *product* market—*i.e.*, the "sale of healthcare services to payors" claimed to be directly impacted by "must have" rural hospitals—is consistent with its alleged geographic market—*i.e.*, the "delivery of healthcare services" in certain counties or the Columbus MSA, which do not include these very same rural

20

facilities. There is an unexplained disconnect between the alleged product and geographic markets in the Complaint: between the "sale of healthcare services to payors" and the "delivery of healthcare services" to patients that "prefer to receive inpatient GAC hospital services at hospitals that are close to their homes." Complaint at ¶ 45, PageID 15-16.

Furthermore, the Complaint fails to plausibly allege a geographic market definition that comports with the legal conclusions that OhioHealth "derives market power from its control of hospitals outside of the Columbus MSA" and that insurance companies "need those hospitals in their provider networks." Complaint at ¶ 50, PageID 18. The Complaint says nothing about where patients of OhioHealth's rural hospitals could rationally look for hospital services. The Complaint does not allege (1) that the rural hospitals have significant shares within the two alleged geographic markets, (2) that each of the counties in which the unidentified rural hospitals are located constitutes a separate geographic market, or (3) that there are no other alternatives available to patients of these rural hospitals. "The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.'" *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022) (citation omitted). It does not necessarily equate to the county or other political boundary lines. *See* John J. Miles, 2 Health Care and Antitrust L. § 15:11 (Analyzing hospital mergers—Relevant geographic market) (2026) ("Arbitrary geographical and political boundaries, such as those of cities, counties, and Bureau of the Census statistical areas, may or may not constitute relevant geographic markets for antitrust purposes.").

### ii. The Complaint Does Not Allege Market Power Based on OhioHealth's Market Share.

The Complaint describes many strong, competing hospital systems in the Columbus region. Complaint at ¶ 42-48, PageID 13-17. The Complaint further alleges that insurance

companies actively compete and seek lower prices and better contract terms in contract negotiations with hospitals in the Columbus region. Complaint at ¶ 17-19, PageID 6-7. These allegations are flatly inconsistent with the claim that positions allegedly taken by one hospital system in the region would harm competition.

In particular, the Complaint alleges three major competitors in Central Columbus: OhioHealth, Ohio State University, and Mount Carmel. The Complaint does not allege any market share information for Ohio State University and Mount Carmel but alleges that OhioHealth—one of the three alleged competitors—has approximately one-third market share. Complaint at ¶ 49, PageID 17-18. The allegations suggest roughly equal market shares with no dominant firm or market power. Even accepting the governments' unsupported claims, 35% market share is not sufficient to state a claim.

Courts consistently reject claims of market power based on market shares below 50%. As Judge Learned Hand stated in 1945, "it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945). The Supreme Court has similarly confirmed that a 30% market share of hospital patients "does not establish the kind of dominant market position" to support a Section 1 claim. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *see also Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 (1953) (finding market share "around 40%" did not equate to market power for Section 1 claim).

### iii.   The Complaint Lacks Allegations That OhioHealth Demonstrated Market Power.

The governments' other attempts to allege market power likewise fall short. The Complaint alleges that at some unspecified point OhioHealth believed that it had "strong profitability".

22

Complaint at ¶ 49, PageID 17-18. Of course, "profitability" does not equate to the ability to charge prices above the competitive level or having market power. Firms in a competitive market are necessarily profitable; otherwise, they would go out of business. A vague allegation that OhioHealth was profitable at some point in time does not plausibly suggest that OhioHealth possessed market power during the relevant time period for the governments' claims.

The Complaint's bare assertion that OhioHealth charged higher prices than some competitors fares no better. "This Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'" *American Express*, 585 U.S. at 549 (quoting *Brooke Group*, 509 U.S. at 237).

The Seventh Circuit examined this flawed reasoning in detail in the context of medical providers and insurance companies:

> But when dealing with a heterogeneous product or service, such as the full range of medical care, a reasonable finder of fact cannot infer monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide—and it is always treacherous to try to infer monopoly power from a high rate of return. Taking the second point first, not only do measured rates of return reflect accounting conventions more than they do real profits (or losses), as an economist would understand these terms …, but there is not even a good economic theory that associates monopoly power with a high rate of return. Firms compete to become and to remain monopolists, and the process of competition erodes their profits. Conversely, competitive firms may be highly profitable merely by virtue of having low costs as a result of superior efficiency, yet not sufficiently lower costs than all other competitors to enable the firm to take over its market and become a monopolist.

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411–12 (7th Cir. 1995), as amended on denial of reh'g (Oct. 13, 1995) (citations omitted).

Further, the governments' cursory allegations of higher prices ignore government price transparency requirements and regulations. The Complaint lacks any allegations that OhioHealth or insurance companies failed to comply with price transparency rules. The Court may take judicial notice of government statutes, regulations, and public records on a motion to dismiss. "[T]aking

23

judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment." *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1014 (S.D. Ohio 2016) (quoting *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir.2012)). Public records show that OhioHealth is transparent about the cost of its services, including providing pricing for all standard services to the government and out-of-pocket cost estimates for over 882 different services on its website available to the public.

Public records also show that any price differences or preference for OhioHealth hospitals are inseparable from recognition of OhioHealth's high quality in the market. According to government CMS Five-Star Quality Rating data referenced in the Complaint, OhioHealth's Riverside Methodist Hospital is the only overall five-star rated hospital in Columbus, Ohio. Complaint at ¶ 10, PageID 4.[5] Falling short of the standard *Twombly* demands to survive a motion to dismiss, the governments fail to allege any facts to suggest that the alleged higher prices do not result from higher quality rather than anticompetitive conduct.

The governments also fail to allege market power in other markets. As explained above, the bare legal conclusion that "OhioHealth derives market power from its control of hospitals outside of the Columbus MSA, some of which are the only hospitals in their counties" is contradicted by the Complaint's alleged market definitions. Complaint at ¶ 50, PageID 18. The Complaint contains no definitions of other relevant geographic markets in which OhioHealth might be alleged to have market power and no plausible factual allegations as to how unspecified market power in another market results in market power in the relevant market.

---

[5] In addition to being the government's own public records beyond dispute, the Court may also take judicial notice of the CMS Five-Star Quality Ratings as documents referenced and misleadingly quoted in the Complaint. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (holding that "if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment").

24

The Complaint lacks plausible allegations of harm to any relevant product and geographic markets and should be dismissed for that reason, as well.

### 4. The Complaint Does Not Allege Illegal Agreements.

While every business contract represents some restraint on trade, only restrictions with recognized anticompetitive effects on competition give rise to a valid antitrust claim. Courts readily dismiss claims under Section 1 of the Sherman Act where plaintiffs fail to allege clearly anticompetitive conduct like pricing restrictions (resale price maintenance), tying, or exclusive dealing. "Unlike many horizontal agreements, such as group boycotts, price cartels, and monopolies, that are entirely void of redeeming competitive value and therefore present 'clear cut cases,' vertical restrictions possess the 'redeeming virtue' of promoting interbrand competition by permitting the manufacturer to achieve certain efficiencies in the distribution of his products." *Care Heating & Cooling*, 427 F.3d at 1013 (affirming dismissal of Section 1 claims).

The Complaint fails to allege any recognizably anticompetitive vertical restrictions. The Complaint alleges that OhioHealth entered purported agreements with insurance companies "to include OhioHealth in all networks for all commercial insurance products," "[e]xcept for limited carve outs," and "requiring that OhioHealth be featured at the most favored level of benefits in each network." Complaint at ¶ 32, PageID 10. The Complaint does not allege that OhioHealth entered any resale-price-maintenance contracts, any tying contracts, or any exclusive-dealing contracts.

As the Supreme Court held in *American Express*, "there is nothing inherently anticompetitive about … antisteering provisions." 585 U.S. at 551. Limiting OhioHealth's discounted pricing to the insurance plans agreed upon by the parties "stem negative externalities" and "promote interbrand competition." *Id.* Allowing patients to receive discounted pricing without OhioHealth receiving the opportunity to compete for the patient volume it bargained for in

25

negotiations undermines the "difficult, time-consuming, and expensive" investments OhioHealth has made to build a hospital with a strong reputation and threatens the viability of OhioHealth's network. Complaint at ¶ 56, PageID 20.

Any purported requirement that OhioHealth be included in the insurance plans as negotiated on at least as favorable terms as any other competitor is necessary to prevent competitors from free riding on the strong reputation OhioHealth built. *American Express*, 585 U.S. at 551 (recognizing that vertical restraints prevent free riding and promote competition) (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007)).

The governments have not alleged any long-term restrictions on competition or any facts that prevent competitors from winning business with lower prices or better contract terms. Critically, the Complaint lacks any allegation that insurance companies lack the ability to terminate their contracts with OhioHealth if they want to renegotiate any terms. The absence of such an allegation defeats the governments' claims, since even exclusive contracts are not illegal if they regularly expire or can be terminated. *Methodist Health Servs. Corp.*, 859 F.3d at 410 ("But what is more common than exclusive dealing? It is illustrated by requirements contracts, which are common, and legal, and obligate a buyer to purchase all, or a substantial portion of, its requirements of specific goods or services from one supplier."); *Paddock Publications*, 103 F.3d at 45 ("[C]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common.").

The Complaint alleges nothing more than purported antisteering agreements, and "there is nothing inherently anticompetitive about … antisteering provisions." *American Express*, 585 U.S. at 551. The Complaint should be dismissed for this additional reason.

**D. The State Antitrust Claims Fail for the Same Reasons as the Federal Antitrust Claims.**

With respect to the governments' claims, the evaluation is the same under federal or state law. "Ohio has long followed federal law in interpreting the Valentine Act." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 8, 106 Ohio St. 3d 278, 281, 834 N.E.2d 791, 795 (2005) (citing *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St.2d 201, 204, 17 O.O.3d 124, 407 N.E.2d 507  (1980) ("These [Ohio antitrust] statutes, known as the Valentine Act, were patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction."). The Court should dismiss the governments' state-law claims for the same reasons already discussed.

**V.     CONCLUSION**

For the foregoing reasons, OhioHealth respectfully requests that this Court dismiss the governments' claims against OhioHealth in their entirety, with prejudice, and grant OhioHealth all other relief this Court deems just and proper.

Dated: May 8, 2026

Respectfully submitted,

*/s/ David M. DeVillers*
David M. DeVillers (0059456), Trial Attorney
Kristopher J. Armstrong (0077799)
BARNES & THORNBURG LLP
41 S. High St. Suite 3300
Columbus, Ohio 43215
Phone: (614)-628-0096
Fax: (614)-628-1433
David.DeVillers@btlaw.com
Kristopher.Armstrong@btlaw.com

Bradley R. Love (*pro hac vice*)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Phone: (317) 261-7896
Fax: (317) 231-7433
Bradley.Love@btlaw.com

27

*Attorneys for Defendant, OhioHealth*
*Corporation*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing motion to dismiss was filed on May 8, 2026, via the Court's CM/ECF system and will be served on counsel for all parties, via email, by operation of that system.

/s/ David M. DeVillers
Attorney for Defendant OhioHealth Corporation

28