## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 25-CV-80526-MIDDLEBROOKS

GOOD SAMARITAN MEDICAL CENTER,
INC., DELRAY MEDICAL CENTER, INC.,
PALM BEACH GARDENS COMMUNITY
HOSPITAL, INC. D/B/A PALM BEACH
GARDENS MEDICAL CENTER, ST.
MARY'S MEDICAL CENTER, INC., AND
WEST BOCA MEDICAL CENTER, INC.,

       Plaintiffs,

v.

THE LEAPFROG GROUP,

       Defendant.

_____/

## <u>ORDER</u>



      A failing grade for hospital safety predictably has severe consequences for any hospital in terms of patient avoidance, doctor retention, employee morale, and community reputation.

      The Leapfrog Group uses a survey, along with other publicly available data sources, to calculate patient safety scores for hospitals across the United States. Under Leapfrog's scoring

methodology, every hospital is assigned a letter grade (A, B, C, D, F) ostensibly to show where a hospital stands in safety performance. The scores are marketed and disseminated to employers, insurers, and the consuming public.

The Leapfrog survey is voluntary and many hospitals, including the Plaintiff Hospitals here, choose not to participate. For those non-participating hospitals, since survey information is not available, Leapfrog uses alternative measures to calculate the safety score. Non-participants do not fare well in these alternative measures of scoring. Even before this lawsuit, Leapfrog has previously received criticism for its methodology and its tendency to discriminate against non-participating hospitals. *See* Wenke Hwang, Jordan Derk, Michelle LaClair, Harold Paz, Hospital patient safety grades may misrepresent hospital performance. 9 J. Hosp. Med. 111 (2014).

But in 2024, Leapfrog decided to double down on its methodology for assigning scores to non-participating hospitals. Put simply, the alternative scoring measures became punishing. Assuming that "non-response bias" suggested that hospitals choosing not to participate necessarily had something to hide with respect to patient safety, Leapfrog began assigning arbitrarily low scores for several measures. Leapfrog also changed the weighting of those measures for non-participants, rendering it almost impossible for these hospitals to receive a passing grade.

Leapfrog's advisory panel of experts never voted to adopt this significant change in methodology. One of the experts suggested that if Leapfrog wanted to penalize non-participating hospitals, it should be very up front about it. And in response to a colleague at a non-participating hospital who described the change as "blackmail," the advisory panel member wrote: "their decision to increase the penalty for nonparticipation was a simple business decision… It's just business, folks!" (DE 191-3 at 1, 4).

Leapfrog's change in methodology has no scientific basis, unfairly penalizes non-participating hospitals, and misrepresents hospital safety. For the reasons that follow, I find that

2

Leapfrog's approach constitutes an unfair and deceptive business practice in violation of the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 501.201 *et seq*.

**BACKGROUND**

Five South Florida Hospitals – Good Samaritan Medical Center, Inc. ("Good Samaritan"), Delray Medical Center, Inc. ("Delray Medical Center"), Palm Beach Gardens Community Hospital, Inc. d/b/a Palm Beach Gardens Medical Center ("Palm Beach Gardens Medical Center"), St. Mary's Medical Center, Inc. ("St. Mary's"), and West Boca Medical Center, Inc. ("West Boca Medical Center") (collectively, "the Plaintiff Hospitals") – brought suit on April 30, 2025, challenging Defendant, The Leapfrog Group's ("Leapfrog") scheme under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq*. (DE 1). The initial complaint sought both money damages and injunctive relief. On August 28, 2025, however, Plaintiffs filed an Amended Complaint, leaving only their request for injunctive relief. (DE 74). I held a five-day bench trial beginning on January 16, 2025, at which time documentary and testimonial evidence were presented. Based on the evidence adduced at the trial, I make the following findings of fact and conclusions of law. (DE 172).

Leapfrog is an independent, national non-for-profit organization. It was founded in 2000 with an admirable goal – to address "severe dysfunction in the health care marketplace." (DE 135 at ¶ 35). Its mission is a laudable one: to "trigger giant leaps forward in the safety, quality and affordability of U.S. health care by using transparency to support informed health care decisions and promote high-value care." (*Id.* at ¶ 36). As part of this mission, Leapfrog established the Leapfrog Hospital Survey in 2001, which "collect[s] and transparently report[s] hospital and ASC performance, empowering purchasers to find the highest-value care and giving consumers the lifesaving information they need to make informed decisions." (*Id.* at ¶ 42). Separate and distinct from the Leapfrog Hospital Survey is Leapfrog's Hospital Safety Grade ("Safety Grade"), first

3

launched in 2012. (*Id.* at ¶ 49). Importantly, Leapfrog's Safety Grade methodology is focused on providing a Safety Grade to all eligible hospitals, regardless of whether the hospital voluntarily reports information requested as part of the Leapfrog Survey. (*Id.* at ¶ 51). A comprehensive review of the methodology is therefore warranted.

### A. <u>The Leapfrog Hospital Grade Methodology</u>

The Leapfrog Hospital Safety Grade is derived from a collection of various measures. The Safety Grade is the product of information from two sources: first, Leapfrog's Hospital Survey, which collects information on quality and safety from participating hospitals, and second, publicly available data from the Center for Medicare and Medicaid Services (CMS). (DAY 1 Trial Transcript at 181). From this data, Leapfrog develops 22 quality safety metrics, which underlie a letter grade from A to F that Leapfrog Group assigns to hospitals twice a year—once in the spring and once in the fall.

Broadly, these measures are split into what Leapfrog calls domains: "Outcome" measures and "Structural/Process" measures. (DE 195-1 at 5). Dr. Sean Nicholson, a health economist and expert witness for Plaintiffs, offered helpful testimony to contextualize the distinctions between these two domains. Ten of the 22 variables are "Outcome" measures. As he explained it, "[a]n Outcome measure would be a measure of a patient's health, such as whether a patient falls while in the hospital or acquires an infection while they are hospitalized." (DAY 1 at 181). The Leapfrog Hospital Safety Grade Scoring Methodology ("Methodology"), for example, describes these as "measures of harm experienced by patients (e.g., central line-associated blood stream infections)." (DE 195-1 at 13). Meanwhile, the remaining 12 measures are characterized as "Structural and Process" measures. Dr. Nicholson described these measures as "an indicator of a hospital's capability of providing safe and high-quality care such as whether they use computerized physician medication entry." (DAY 1 at 181). Likewise, the Methodology describes these as "measures of

compliance with best practices in patient care." (DE 195-1 at 13). Each domain accounts for 50% of the final Safety Grade.

At a more granular level, it is helpful to understand the data sources underlying Outcome and Structural/Procedural measures.[1] Five of the ten variables that comprise the Outcome measures are derived from CMS data. (DE 129 at ¶ 137; DE 195-1 at 7). The remaining five measures are collected from the Leapfrog Hospital Survey. For Structural/Process measures, on the other hand, five of the 12 measures are derived from CMS data, while the remaining seven are derived from the Leapfrog Hospital Survey. (DE 195-1 at 5, 6).

Leapfrog has various ways of dealing with missing data. For the five Outcome measures derived from the Leapfrog Survey, where that primary data source is unavailable, Leapfrog relies on available CMS data (DE 195-1 at 7). For the remaining five Outcome measures, where primary CMS data is unavailable, there is no secondary data source, meaning that the hospital cannot be scored on that measure. As for the Structural/Process measures, the process is slightly different. Like the Outcome measures, where Structural/Process measures relying on CMS data as the primary data source lack the requisite data, no secondary data source is available. (*Id.* at 6). For three of the remaining Outcome measures, scoring "safe practices" including culture of leadership, feedback & intervention, and the nursing workforce, when Leapfrog Hospital Survey data is unavailable, there is similarly no secondary source available. This leaves us with the final four Structural/Process measures: Computerized Physician Order Entry (CPOE), Bar Code Medication Administration (BCMA), ICU Physician Staffing (IPS), and Hand Hygiene. Each of these measures ordinarily rely on the Leapfrog Hospital Survey as the primary data source. But what distinguishes them is the "imputation" applied to these measures where no Survey data is available

---

[1] The following information is taken from PX-001.0, which is Leapfrog's Spring 2023 Hospital Safety Grade Scoring Methodology. The information provided is consistent with Leapfrog's 2024 Methodology for purposes of offering background.

– in these situations, the "Secondary Data Source" is simply an assignment or "imputation" of a certain score.

The core issue in the instant case involves the Fall 2024 Methodology change pertaining to this "imputation" of missing data. The Spring 2023 Methodology incorporated a "two-step" imputation approach. (DE 195-1 at 15). "Step 1" used a hospital's most recent score on the measure.[2] Where no data was available for CPOE, BCMA, and Hand Hygiene, Leapfrog would turn to "Step 2" and assign a score reflecting the mean score assigned to other similar hospitals in the U.S. (*Id.*).[3]

In Fall 2024, Leapfrog altered the imputation model to address an understandable issue: Hospitals who did not respond to the Survey were receiving what Leapfrog perceived to be an undeserved benefit by imputing the cohort means of hospitals participating in the Survey for CPOE, BCMA, and Hand Hygiene. (DE 135 at ¶ 87). Now, Step 1 assigns a hospital its most recent score for CPOE, IPS, and Hand Hygiene measures if the hospital had a score assigned by Leapfrog in the previous two rounds of grades. (DE 195-2 at 15). Where no historical data exists for the last two rounds, Step 2 assigns a point value that is equivalent to "Limited Achievement." (*Id.*). Notably, this imputed Step 2 score is not zero. "Limited Achievement" scores account for and give credit to hospitals for having a CPOE and BCMA system, Hand Hygiene Policy, and ICU. (DE 135 at ¶ 103). Instead of zero, each of CPOE, BCMA, IPS and Hand Hygiene have different, seemingly random, Limited Achievement Scores: 15, 25, 5, and 15, respectively. (*Id.*).

---

[2] The 2023 Methodology explains that for CPOE, BCMA, and Hand Hygiene, if the hospital had a score assigned by Leapfrog in the previous four rounds of grades (*i.e.*, fall 2022, spring 2022, fall 2021, spring 2021). For IPS, it extended to a score assigned by Leapfrog in the previous five rounds, thereby including fall 2020 as a potential data source. (DE 195-1 at 15).

[3] Under Step 2 for IPS, Leapfrog used the CMS Cost Report to determine whether a hospital had one or more medical, surgical, and/or pediatric ICU beds, and if so, the hospital was assigned the associated "Limited Achievement" score. (DE 135 at ¶ 85; DAY 2 at 190).

These scores are "assigned" based on the lowest score of a participating hospital for that measure. Importantly, testimony explained that no single participating hospital received "Limited Achievement" across all four of these measures. (DAY 1 at 187-88).

Focusing only on the 2024 Safety Grade Methodology, and particularly only on the Structural/Process measures, the weights assigned to those measures differed based on whether the hospital participated in the Survey. Drawing on Leapfrog's Methodology, Dr. Nicholson offered testimony that emphasized the weight difference between participating and non-participating hospitals. For a participating hospital, the five CMS-derived Structural/Process scores constitute 15% of the total letter grade. The four Leapfrog Survey-derived measures that would otherwise be subject to imputation account for 24% of the grade. And the three "safe practices" scores account for 11%. (DAY 1 at 182). When grading a non-participating hospital, however, these three "safe practices" scores are excluded from the grading calculation; the 11% weight is then reassigned to the remaining two categories on the structure and process side, the CMS data and Leapfrog Survey-derived data. (*Id.* at 183; DE 195-2 at 22). As a result, the four imputed low scores carried increased weight—from 24% for a participating hospital to 31% for a non-participating hospital.

In arriving at this methodology change, Leapfrog has consistently relied on their Expert Panels. Leapfrog utilizes 13 separate and distinct expert panels to review and provide guidance on respective sections of the Leapfrog Hospital Survey ("Survey Panel") and a separate expert panel presides over Leapfrog's Hospital Safety Grades ("Safety Grades Panel"). (DE 135 at ¶ 37). The Survey Panels consist of ten experts, who offer guidance on the various measures. (DAY 3 at 90); (DE 195-107 at 2, 3). This includes an expert panel that oversees the CPOE, BCMA, IPS, and Hand Hygiene measures. (*Id.*). The Safety Grades Panel is charged with providing guidance to the Leapfrog Group on its grading methodology. The Safety Grades Panel debated the various approaches to account for missing data. (DAY 1 at 194). As Dr. Patrick Romano, who has served

on the Safety Grades Panel since 2011 explained, the Panel's role was advisory in nature. The Panel did not actually vote in favor or against the methodology change. (DAY 2 at 182-83).

B. **The Plaintiff Hospitals & The Leapfrog Website**

The five Plaintiff Hospitals, owned and operated by Tenet Health Care, were some of these non-participants in the Leapfrog Survey. The Plaintiff Hospitals first chose to stop participating in the Leapfrog Survey during the COVID-19 pandemic because, as one Hospital CEO explained, they chose to reallocate resources in the face of significant operational strain. (DE 203 at ¶ 49). Following the 2024 methodology change, these non-participating hospitals received imputed scores on the four metrics, accounting for 31% of their total grade. Taking each hospital in turn, and as depicted in the chart below, Good Samaritan received a "C" Safety Grade in Spring 2024, prior to the methodology change and a "D" Safety Grade in Fall 2024, after the change; Delray Medical Center received a "D" Safety Grade in Spring 2024 and an "F" Safety Grade in Fall 2024; Palm Beach Gardens Medical Center received a "C" Safety Grade in Spring 2024 and an "F Safety Grade in Fall 2024, St. Mary's received a "C" Safety Grade in Spring 2024 and an "D" Safety Grade in Fall 2024, and West Boca Medical Center received a "D" Safety Grade in Spring 2024 and an "F" Safety Grade in Fall 2024. (*Id.* at ¶¶ 51, DE 204 at 36, 39).

| Plaintiff Hospitals' Leapfrog Safety Grades | | | | | |
|---|---|---|---|---|---|
| | **Delray** | **Good Samaritan** | **Palm Beach Gardens** | **St. Mary's** | **West Boca** |
| **Spring 2024** | D | C | C | C | D |
| **Fall 2024** | F | F | F | D | D |
| **Spring 2025** | F | D | F | D | F |
| **Fall 2025** | F | D | D | D | D |

*(See* DE 129 at 151).

8

These grades are readily available and apparent on the Leapfrog Hospital Safety Grade website. On the Safety Grade Website, viewers can search for a hospital by city, state, zip code, or hospital name. After entering a search, the viewer is shown that hospital's Safety Grade with a hyperlink to "view the full score." If a viewer clicks or taps on a hospital's name, assigned Safety Grade, or "view the full score," the consumer is brought to that hospital's profile webpage, where the hospital's most recent Safety Grade is displayed at the top of the page. Here, the viewer may review recent past grades, the hospital's Survey results, or the specific measures comprising the hospital Safety Grade.



9



(*See* DE 203 at 15, 16).

On the hospital profile webpage, there are five tabs titled "Infections," "Problems with Surgery," "Safety Problems," "Practices to Prevent Errors," and "Doctors, Nurses & Hospital Staff." When a viewer clicks or taps on one of the five tabs, they are shown measures included in the tab category and a corresponding red, yellow, and green "gas gauge" for each measure. This gas gauge serves as an "evaluative label" by visually representing how Leapfrog has scored a hospital's performance on a measure. (DAY 2 at 9). Red conveys that Leapfrog has scored a hospital "Worse Than Average" performance; yellow conveys that Leapfrog has scored a hospital average performance; green conveys that Leapfrog has scored a hospital "Better Than Average" performance. A consumer can view a hospital's measure score by clicking or tapping the corresponding "gas gauge" graphic.

10



Each measure webpage shows "This Hospital's Score," "Best Hospital's Score," "Average Hospital's Score," and "Worst Hospital Score"; describes the measure; and includes "Notes and Definitions" footnotes beneath the measure descriptions. Every measure webpage for a non-responding hospital includes a red, bolded footnote under "Notes and Definitions," stating that hospital "**Declined to Report: The hospital was asked to provide this information to the public, but did not.**"

11



The scores for the four imputed Measures, CPOE, BCMA, Hand Hygiene, and IPS, can be found by clicking or tapping into the respective measures "Doctors order medications through a computer," "Safe medication administration," "Handwashing," and "Specially trained doctors care for ICU patients." Unlike the other tabs, only when a user clicks or taps on one of the four measures for a non-participating hospital, an asterisk (*) appears next to the measure score underneath "This Hospital's Score." The asterisk (*) is associated with a red, bolded footnote stating, "**\*The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available**" that is reflected in the "Notes and Definitions." Meanwhile, if a hospital does not respond to the Survey, the "safe practices" measures, "Effective leadership to prevent errors," "Nursing and Bedside Care for Patients," and "Staff work together to prevent errors," show a question mark displayed with "Declined to Report" over the respective gas gauge

on these measures for that hospital.



The scoring methodology can be accessed in two ways. Clicking a link at the top of a hospital's profile webpage that says "Detailed table view" takes a consumer to a new webpage that contains two tables displaying the hospital's most recent numerical score on each measure. After scrolling to the bottom, a user will see a hyperlinked text that reads, "For a full description of the methodology, click here."[4] Clicking or tapping the link takes the consumer to a PDF version of Leapfrog's current "Scoring Methodology" document.

---

[4] The accompanying demonstrative was taken from the Plaintiff Hospitals' Proposed Findings of Fact and Conclusions of Law (DE 136) that was submitted to the Court before trial, and before the Parties both submitted revised filings following trial.

13



**This Hospital's Grade**

**FALL 2025**

### Delray Medical Center

5352 W Linton Blvd
Delray Beach, FL 33484-6580
Map and Directions

Outcomes measures include errors, accidents, and injuries that this hospital has publicly reported.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Dangerous object left in patient's body What's This? | 0.000 | 0.256 | 0.011 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Air or gas bubble in the blood What's This? | 0.000 | 0.050 | 0.001 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Patient falls and injuries What's This? | 0.486 | 1.748 | 0.338 | 0.000 | CMS | 07/01/2022 - 06/30/2024 |
| Infection in the blood What's This? | 1.075 | 2.362 | 0.586 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Infection in the urinary tract What's This? | 0.576 | 2.399 | 0.522 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Surgical site infection after colon surgery What's This? | 3.098 | 3.229 | 0.856 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| MRSA Infection What's This? | 0.271 | 2.685 | 0.689 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| C. diff. Infection What's This? | 0.276 | 1.486 | 0.370 | 0.000 | CMS | 10/01/2023 - 09/30/2024 |
| Death from treatable serious complications What's This? | 108.94 | 235.51 | 177.47 | 84.66 | CMS | 07/01/2021 - 06/30/2023 |
| Harmful Events What's This? | 1.03 | 3.10 | 1.00 | 0.53 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous bed sores What's This? * | 0.56 | 7.50 | 0.64 | 0.05 | CMS | 07/01/2021 - 06/30/2023 |
| Collapsed lung What's This? * | 0.20 | 0.65 | 0.25 | 0.10 | CMS | 07/01/2021 - 06/30/2023 |
| Falls causing broken hips What's This? * | 0.31 | 0.56 | 0.29 | 0.15 | CMS | 07/01/2021 - 06/30/2023 |
| Blood Leakage What's This? * | 2.22 | 5.53 | 2.42 | 1.01 | CMS | 07/01/2021 - 06/30/2023 |
| Kidney injury after surgery What's This? * | 1.61 | 4.60 | 1.69 | 0.74 | CMS | 07/01/2021 - 06/30/2023 |
| Serious breathing problem What's This? * | 9.54 | 57.80 | 10.52 | 1.94 | CMS | 07/01/2021 - 06/30/2023 |
| Dangerous blood clot What's This? * | 5.06 | 8.15 | 3.90 | 1.56 | CMS | 07/01/2021 - 06/30/2023 |
| Sepsis infection after surgery What's This? * | 6.71 | 12.56 | 5.62 | 1.95 | CMS | 07/01/2021 - 06/30/2023 |
| Surgical wound splits open What's This? * | 1.60 | 4.00 | 1.87 | 1.13 | CMS | 07/01/2021 - 06/30/2023 |
| Accidental cuts and tears What's This? * | 1.03 | 2.41 | 0.89 | 0.28 | CMS | 07/01/2021 - 06/30/2023 |

\* This measure is a part of the Harmful Events Composite and is not used for scoring.

Process measures include the management structures and procedures a hospital has in place to protect patients from errors, accidents, and injuries.

| Measure | The Hospital's Score | Worst Performing Hospital | Avg. Performing Hospital | Best Performing Hospital | Data Source | Time Period Covered |
|---|---|---|---|---|---|---|
| Doctors order medications through a computer What's This? | 15 | 15 | 82.22 | 100 | Imputation Model Applied | Not Applicable |
| Safe medication administration What's This? | 25 | 25 | 85.20 | 100 | Imputation Model Applied | Not Applicable |
| Specially trained doctors care for ICU patients What's This? | 5 | 5 | 67.86 | 100 | Imputation Model Applied | Not Applicable |
| Effective leadership to prevent errors What's This? | Declined to Report | 46.15 | 117.60 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Staff work together to prevent errors What's This? | Declined to Report | 0.00 | 117.27 | 120.00 | 2025 Leapfrog Hospital Survey | 2025 |
| Nursing and Bedside Care for Patients What's This? | Declined to Report | 15 | 79.09 | 100 | 2025 Leapfrog Hospital Survey | 01/01/2024 - 12/31/2024 |
| Handwashing What's This? | 15 | 15 | 76.81 | 100 | Imputation Model Applied | Not Applicable |
| Communication with nurses What's This? | 80 | 76 | 90.37 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Communication with doctors What's This? | 82 | 75 | 89.99 | 97 | CMS | 10/01/2023 - 09/30/2024 |
| Responsiveness of hospital staff What's This? | 67 | 62 | 81.81 | 96 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about medicines What's This? | 62 | 59 | 74.64 | 88 | CMS | 10/01/2023 - 09/30/2024 |
| Communication about discharge What's This? | 74 | 67 | 85.48 | 94 | CMS | 10/01/2023 - 09/30/2024 |

For a full description of the methodology, click here.

(DE 136 at 109).

14

Alternatively, a viewer may also access the methodology by scrolling to the website footer, wherein a hyperlinked text reading "Methodology" is available under the header "For Hospitals."



## DISCUSSION

Plaintiffs assert one claim seeking declaratory and injunctive relief against The Leapfrog Group, alleging a violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. § 501.201 *et seq.* (DE 74).

FDUTPA prohibits "[u]nfair competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A plaintiff may establish a violation of FDUTPA by proving either unfairness or deception. Fla. Stat. § 501.211 sets out the individual remedies available against a party that has been shown to violate FDUTPA. Notably, the requirements for damages and injunctive relief are somewhat distinct. In an action for injunctive relief, Fla. Stat. 501.211(1) permits "anyone aggrieved" to seek injunctive relief against "a person who has violated, is violating, or is otherwise likely to violate this part."

15

**A. The Plaintiff Hospitals are Aggrieved Parties**

As a threshold matter, any plaintiff must be "aggrieved" within the meaning of the statute. Whether the Plaintiff hospitals (as opposed to the consuming public) are "aggrieved" within the meaning of the statute is in dispute. Leapfrog seems to rely on *Macias v. HBC of Florida, Inc.*, in arguing that the Plaintiff Hospitals are not aggrieved. The court in *Macias* held:

> The clear intent of this statute as expressed by its plain language is to provide both equitable and legal remedies to private *consumers* who are aggrieved parties and/or have sustained actual losses because of a violation(s) under FDUTPA. Thus, in order for the *consumer* to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but *the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act.*

694 So.2d 88, 90 (Fla. 3rd DCA 1997) (emphasis added); (DE 204 at ¶ 491). In effect, Leapfrog attempts to narrow the scope of who might be considered an aggrieved party by requiring that the party must also be a "consumer" in order to pursue injunctive relief.

But this reads language into the statute that simply is not there and undermines the broad reach of the term "anyone aggrieved." Although the term "aggrieved" is not defined in FDUTPA, relevant caselaw has explained it broadly as "being more expansive than 'damaged' or 'suffered a loss.'" *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015). I agree that as part of this inquiry, all that is required at this step is the ability to "demonstrate some specific past, present, or future grievance." *Id.* at 173. Applicable caselaw has suggested that, just as a claimant need not be a consumer to obtain damages, a claimant seeking equitable relief similarly does not have to be a consumer so long as it may show it has been aggrieved and can establish a violation of FDUTPA. *See Stewart Agency, Inc. v. Arrigo Enters., Inc.,* 266 So. 3d 207, 214 (Fla. 4th DCA 2019) ("We [have] held … that although a claimant does not have to be a consumer to state a claim for actual damages under section 501.211(2), to satisfy all of the elements of a FDUTPA claim, it must show that a consumer was injured or suffered a detriment. Similarly, here, under section 501.211(1), an

16

entity may bring an equitable claim under FDUTPA, but only if it presents evidence of the required elements." (internal citations omitted)).

In any event, the Plaintiff Hospitals, not just patients, may be considered consumers of the Leapfrog's product. With the benefit of trial, it became clear that hospitals were a specific target of the information disseminated in the Leapfrog Grade. Testimony indicated that the poor scores would be used to "harass" the hospitals who chose not to participate, and that part of the general strategy was to "become a Disney villain," which at the least indicates that a central goal of the Hospital Safety Grade included shaping hospital behavior, like patient decision-making. (DE 203 at ¶ 113). For hospitals who were high performing, on the other hand, Leapfrog's marketing materials offer "designated logos" and licensing structures that enable those hospitals to promote their scores to employees, prospective employees, patients, and the broader community. (*Id.* at ¶ 120). Leapfrog's suggestion that there is a free alternative does not change the calculus here; the mere fact that hospitals may pay for licensed materials is sufficient to classify it as a consumer of that information.

And in my view, so too are various other third-parties who may have been aggrieved as a result of Leapfrog's Safety Grades Methodology. These parties would include the employees of hospitals that received non-participation assignments and the entities (e.g., insurers) who paid for and received data from the Hospital Survey. (*Id.* at ¶ 121). To illustrate why this is so, take for example, a mobile phone app for food delivery. Conceivably, the consumers of the app's functions extend beyond the customers who use the app to view restaurants and order. Various parties presumably alter their behavior in response to the changes to the app. Featured restaurants may offer deals, expedite food preparation strategies, and review their ratings to change behavior; delivery drivers may station themselves near restaurants that the app has identified as "hot spots," accept bundled orders, or operate only during peak windows. Similarly, in the hospital rating

17

context, changes to Leapfrog's Methodology may influence a range of actors beyond the hospitals. Ultimately, limiting the scope of *who* was a consumer of the Leapfrog Safety Grade improperly diminishes the impact the grade has on the patient and medical community, while undermining the noteworthy harms it imposes on each of them.

**B.        Leapfrog's Grades for Non-Participating Hospitals are Unfair and Deceptive**

An aggrieved plaintiff is next required to prove that the defendant's practice is either "unfair" or "deceptive." Specifically, the aggrieved entity must identify a violation of FDUTPA, meaning "an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc.*, 266 So. 3d at 214. Caselaw has established that "unfair" and "deceptive" practices constitute two different concepts. The Florida Supreme Court has defined "unfair practice" as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla.2003) (cleaned up). Alternatively, the modern, three-factor unfairness test deriving from the FTC's 1980 Policy Statement, which is codified into Section 45(n) of the FTC Act sets out a different standard. *See* 15 U.S.C. § 45(n). Conduct under the modern three-factor test is "unfair" when it inflicts "consumer injury that is: (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) … that consumers could not reasonably have avoided." *SMS Audio, LLC v. Belson, 2017 WL 1533941, at \*3 (S.D. Fla. Mar. 9, 2017) (Middlebrooks, J.)* (citing *Porsche Cars N. Am., Inc.*, 140 So. 3d at 1096–97). Courts differ in which to apply, or even apply both. In the instant matter, the choice of tests is not outcome determinative, and it is therefore sufficient to apply both tests.

Separately, the Florida Supreme Court has defined "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id.* In my Order denying the Parties' Motions for Summary

Judgment, I had suggested that past consumer harm could be a *required* showing to demonstrate an "unfair" practice, whereas a deception claim under FDUTPA need not require past harm and instead requires "deceptions that are likely to cause injury to a reasonable relying consumer." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000); (DE 139).

On the same day as my decision, the Eleventh Circuit issued its opinion in *FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026). Although "unfairness" and "deception" appear to target different acts or practices, this decision clarifies that the ultimate harm requirements to obtain injunctive relief remain identical. Specifically, the case emphasizes that a practice is "'unfair' if it '[1] causes **or is likely to cause** substantial injury to consumers which is [2] not reasonably avoidable by consumers themselves and [3] [is] not outweighed by countervailing benefits to consumers or to competition.'" *Id.* at 839 (quoting 15 U.S.C. § 45(n)) (emphasis added). The existing caselaw across state and federal law has sometimes conflated requirements across damages, injunctive relief, and requirements for deception as opposed to unfairness. However, this case is clear in emphasizing the proper standard for evaluating "unfair" practices. It explains that a practice cannot be "unfair unless the act or practice *causes or is likely to cause substantial injury to consumers* which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 840.[5] In other words, "deception" and "unfairness" analyses under FDUTPA are each satisfied for purposes of injunctive and declaratory relief by a showing that a defendant's conduct is likely to cause injury to consumers.

---

[5] This case, although post dating the date set forth by Fla. Stat. § 501.203(3)(b) for which based upon the July 1, 2017, the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission (FTC) or the federal courts serve as the operative law, nevertheless relies on interpretations advanced by the FTC as it existed as of July 1, 2017.

In any event, Plaintiffs have brought evidence establishing both past harm and a likelihood to harm consumers in the future. The various harms of non-participation assignments come to light upon review of *why* Leapfrog opted for the non-participation grade assignment, *how* Leapfrog leads the public to interpret and rely upon its data, and the conceivable, and actual, impacts of these practices.

### 1.    *Leapfrog's Motives in Opting for the Assignment Methodology*

To begin, testimony offered at trial made clear why Leapfrog opted for a methodology that would assign non-participating hospitals the lowest score possible. And in determining whether its practices are deceptive or unfair (or both), Leapfrog's intent matters. Leapfrog understood that penalizing hospitals could impact their grades, which they intended consumers to rely on as *accurate* representations of hospital safety, thereby leveraging consumer perception to force hospitals back into participating in the Leapfrog Survey. Upon review, I find that Leapfrog's assignment methodology is punitive in nature.

Leapfrog suggests that the methodology cannot be punitive because of the nature of composite scoring. (DE 204 at ¶ 83). In support, Leapfrog contends that because composite scoring allows for so many combinations of measure scores, the four measures at issue in this case cannot drive the final grade. (*Id.* at ¶ 85). With respect to the four imputed scores, Leapfrog's expert, Mark Rule, a partner and managing director at a global consulting firm, testified that if he were to "pull out the four imputed inputs that the Plaintiffs take issue with" and ask whether "that really materially change[s] the grading" his conclusion is that it does not. (DAY 4 at 15:6—10). The effect of Rule's counterfactual is that by assigning no weight to the imputed scores by assigning each N/A, and instead redistributing those weights across the data points for which Leapfrog does have access to data, the poor scores of each of these hospitals remain the same. (DAY 4 at 20:18—23). In contrast, Plaintiffs' expert, Dr. Sean Nicholson, provides a competing counterfactual, which

he described as follows: "If the non-participants in fact participated, what I do in the counter factual is, I give the nonparticipants the mean score for the seven structure and process measures that are not available for the Leapfrog Group for the nonparticipants… That is the only change I am making." (Day 1 at 197:5—10).

Remarkably, the evidence at trial did not bear out a dispositive answer to whether these four do in fact create a meaningful difference in the Safety Grades. Each expert testified to the result of their counterfactual and ultimately arrives at different conclusions. Broadly, however, a counterfactual suggesting that the hospitals were nevertheless poor performers seems outside the ambit of a FDUTPA claim. Whether the scores are "technically or materially true is not persuasive" when the material implication of Leapfrog's representations is that it constitutes a full and accurate representation of patient safety. *F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942 at 2 (11th Cir. 2007). As a general matter, it is the deceptive nature of representations made to the consumers that drives my analysis under FDUTPA.

There are nevertheless several considerations supporting Plaintiff's contention that the low assignments do, in fact, produce worse results. First, Mr. Rule's methodology is inapplicable to this case. Leapfrog *could* have assigned the hospitals "N/A" scores, but as a result would not have been able to grade those hospitals under its own principle preventing hospitals missing more than six measures from being scored. Leapfrog did not adopt this approach. Second, the facts of the case serve as the clearest evidence that grades did decrease following the methodology change, tending to show the adverse impact of the low assignment scores. Third, the testimony at trial suggests that Leapfrog viewed this methodology as a punitive measure, suggesting that Leapfrog *intended* that lower scores would be a result. For example, Dr. Patrick Romano, contemporaneously labeled the assignment penal in nature and wrote in an email to members of Leapfrog's expert panel and Leapfrog members, that: "if the goal is to penalize nonparticipants,

you might as well do so in a clear and unmistakable manner." (DE 189-55). He later continued to state that an alternative approach would not "achieve your strategic objective of penalizing nonparticipants," before characterizing the assignment a "backdoor approach to penalizing nonparticipation." (DE 189-55). Chief Executive Officer of Leapfrog, Leah Binder, had also contemporaneously suggested "imputing… the lowest score" would be a "very big deal to hospitals (and a major incentive to report to the survey)." (DE 193-52 at 1). The incentive was clear: the hospital should participate to avoid non-participation scores that could carry significant consequences.

The nature of this methodology change was also immediately clear to the commentators who responded to Leapfrog's request for comments. Testimony at trial revealed that four commentators opposed penalizing hospitals that choose not to devote resources to completing a voluntary survey each year and, instead, be allowed to opt out of the hospital Safety Grade. (DAY 2 at 257:20—23). Additionally, take for example, Dr. Romano's email to his colleagues at the University of California Davis ("UC Davis"), which received a D-grade. There, Dr. Romano chastised the decision not to participate in the Survey, and emphasized that such nonparticipation was "the real killer." (DE 191-3 at 2). Meanwhile, Plaintiffs proffered evidence that since Fall 2024, not a single non-participating hospital has received an "A" Safety Grade while subject to the non-participation penalty on all four measures. Leapfrog puts forward conflicting evidence, in the form of an email from Dr. Matthew Austin, a scientific advisor for the Leapfrog Group, who "quickly pulled the breakdown of Spring 2025 grades by survey submission status," which indicated that two hospitals that were assigned the penalties nevertheless received "A" grades. (DE 192-47 at 1). Compare this, however, with the 902 hospitals that submitted Surveys and received an "A" Safety Grade. (*Id.*) Or compare it with the fact that in Spring 2025, not a single participating hospital received an "F" failing grade. (DAY 1 at 189:3—6; DE 192-47 at 1). Taken together, it

22

may not be impossible for a non-participating hospital to score an "A," but it is certainly telling of the divergent outcomes that accompany nonparticipation and participation.

Evidence suggests that Leapfrog's approach worked. Dr. Romano's UC Davis chose to continue participating in the Survey following "peer pressure from other UC hospitals." (DAY 2 Trial at 169:3-17). And they were not alone. Participation following the 2024 change jumped from 73% to 79%; meanwhile, participation in 2023 was only 64%. (DE 193-109).

In sum, the contemporaneous testimony, internal communications, industry reaction, and resulting participation data collectively demonstrate that Leapfrog's lowest-score assignment was deliberately designed to coerce participation through reputational penalty, rendering the Methodology not merely strategic but excessively punitive.

### 2. *Leapfrog's Representations on How to Use the Grade*

Further deception is evident in how Leapfrog's website encourages consumers to rely on the Hospital Safety Grade both in its (1) descriptions of how to use the grade, and (2) explanations of how the data itself was collected.

On a page titled "How to Use the Grade," Leapfrog represents that it is offering users a "tool [that] can help guide your decision." (DE 195-31 at 1). It further states that "we know 'A' hospitals do a better job at preventing errors." (*Id.* at 2). In distinguishing reliance on historical grades from present grades, the website cautions consumers that patients should always decide on where to receive care based on a hospital's *current* Safety Grade. (*Id.*). It is also worth noting that Leapfrog disclaims to consumers that "[y]ou should never refuse care in an emergency because of a hospital's Safety Grade, but use this website as a guide for planned events and a research tool for potential emergencies." (*Id.*) Altogether, this section of the website clearly intends for consumers to depend on the information presented by Leapfrog in the ordinary course, and that information is based on "known" data.

23

A separate section of the website, titled "Frequently Asked Questions About The Leapfrog Hospital Safety Grade," explains that "Johns Hopkins Medicine researchers estimate that ***patients are twice as likely to die of a preventable problem at a "C," "D," or "F" hospital*** than an "A" hospital." (DE 195-23 at 1) (emphasis added).

When questioned on cross examination about this ominous language, Leapfrog's own Vice President of Development conceded that "Leapfrog want[s] consumers to think that visiting a hospital with a C, D or F grade could seriously injure or even kill them." (DAY 3 at 8:17—9:16). It does not strain credibility to presume that this type of warning would seriously deter a person from entrusting their health and safety, or their loved one's health and safety, to a D or F rated hospital. It may also cause concern for the various hospitals and employees involved in the health system, who face real reputational harm in the face of failing grades.

### 3. *Leapfrog's False Representations that the Data was Supported by Real Data and Reflected Actual Performance.*

Next, Leapfrog seeks to persuade the public of the soundness of its methodology, emphasizing on its website that the Safety Grades are supported by real data and reflect actual safety performance, as opposed to being driven by Survey participation of the rated hospitals. However, the assignments are anything but comprised of real data. At the highest level, Leapfrog explains on its Frequently Asked Questions that "the Hospital Safety Grade uses a public, peer-reviewed methodology, calculated by top patient safety experts under the guidance of a National Expert Panel." (DE 195-23 at 1). But this methodology was *not* peer-reviewed. (DE 163-1 at 90:15—17).[6] Moreover, in its "About the Grade" section. Leapfrog represents to website visitors that:

---

[6] Additionally, the Fall 2024 change in methodology was not approved by Leapfrog's Expert Panel or voted on by its Board of Directors. (DE 163-1 at 285:7–15 ("We did not query the [E]xpert [P]anel about whether they approved [the methodology] or not."; DE 163-2 at 105:18—22

> In some cases where a hospital's information is not available for a certain measure, Leapfrog uses a supplemental data source. In cases where a hospital's information is not available from any data source, Leapfrog has outlined a methodology for dealing with the missing data.

Of course, the central issue here concerns the methodology for dealing with the missing data – it suggests to a reasonable consumer that the grades assigned reflect actual performance when in fact they do not; they reflect nonparticipation. Compelling evidence supports this conclusion. Take Leapfrog's use of gas gauges, for example. They distinguish between a low gauge and a gauge prominently displaying a question mark with the caption "Declined to Report." These graphics signal to consumers that a gas gauge without the question mark reflects something about *actual* performance rather than missing, unavailable, or imputed low scores. Then, Leapfrog appends a ubiquitous footnote to *all* measure webpages, not just those for non-participants, stating "**Declined to Report: The hospital was asked to provide this information to the public, but did not.**" The effect of this is to suggest that metrics not linked to this footnote are based on real data, even for non-participating hospitals. Similarly, rather than assigning a score of "zero" for a non-participating hospital – a value that would logically signal such non-participation and therefore a lack of information upon which to base a rating – Leapfrog instead chose arbitrarily low numbers (5, 10, 15 out of 100), the clear implication being that the hospital was graded based on *something,* when in truth it was based on nothing. Compounding the deceptive nature of these representations, Leapfrog also explains that Leapfrog would not grade certain hospitals missing more than six measures juxtaposed with the statement that "The Hospital Safety Grade reflects how well a hospital does on safety, not whether they complete the Leapfrog Survey." (DE 195-23

---

("[T]here was no board vote in June 2024 on whether [Leapfrog] should change its safety grade methodology.")).

at 2).[7]   All of this is intended to create the false impression that Leapfrog's grades reflect actual performance.  Or even at least *some* performance!  But the grades are not based upon performance. The grades are the result of Leapfrog's acknowledged goal of punishing nonparticipants as a means of forcing hospitals to cooperate in submitting their Surveys. Taken together, there are simply too many suggestive labels implemented by Leapfrog that create the misleading impression that the scores assigned represented real data or performance.

Leapfrog attempted to cast its methodology in different light, but I remain unconvinced. For instance, Leapfrog offered the analogy that a teacher may explain to the student that they have received an "F" because, although you have answered, correctly, the first sixteen questions of a multiple-choice exam, the remaining questions were "short answer" questions. For these questions, you were expected both to answer the question correctly and to "show your work" in arriving at that answer. Here, although you have answered the question correctly, you nevertheless failed to show your work. In Leapfrog's view, the "answer" was Leapfrog's knowledge that the hospitals had *some* system in place for each of the assignment measures. So, for example, by having a handwashing system in place, the hospital was assigned the lowest possible score. Filling out the Survey, or showing your work, could mean a higher score.  At first glance, such an example may seem apt, and even fair. But consider this wrinkle: you never took the test to begin with. In fact, you were never even enrolled in the class; and yet, your "F" is broadcasted for your peers, employers, and mentees to see. Here, the Plaintiffs never "enrolled" in Leapfrog's Survey, and they were inevitably punished for that decision. In my view, even a score of "0" would improperly

---

[7] To be sure, this representation was available in the methodology document, which suggests that if viewers could identify this representation, they also could have identified the assignment methodology. But the great weight of the evidence that any viewer will have already encountered has likely already caused a viewer to assume that the data presented means something more than non-participation before they arrive at the complex assignment methodology.

26

suggest to viewers that a hospital's performance is inadequate and falls far below its peers, when in fact the simple truth is that the hospital did not participate.

Additionally, there was simply no reason to suggest that the hospitals were actually performing as poorly as suggested by the scores. Several pieces of evidence are significant here. First, past performance by the Plaintiff Hospitals, prior to any potential free riding on the means of participating hospitals, suggested scores are conceivably much higher than the scores assigned following the Methodology change. In 2021, when the Plaintiffs last participated in the Survey, their score across each of the four measures totaled 370 out of a possible 400; compare this with 60 out of a possible 400 following assignment. (DAY 1 at 14:5—8). Second, although no participating hospital was assigned the lowest possible score across *all* four measures, the non-participating hospitals were. The average participating hospital in Spring 2025 obtained a score of 362 out of a possible 400 on these four measures; compare that with the 60 out of 400 obtained by the non-participating hospitals. Third, neither Leapfrog's expert Dr. Harris, nor Leapfrog itself, performed any analysis to support the notion that Survey nonparticipation or performance on CMS metrics could be a reliable indicator of whether non-participating hospitals actually perform worse on the three measures. (DAY 4 at 102:4—8, 102: 21—24). Fourth, in Fall 2024, Regina West, Quality Director of the Palm Beach Health Network, a coalition of the Plaintiff Hospitals, conducted a "What If" analysis indicating that, had scores not been imputed, the Plaintiffs could have received C grades. (DE 188-68). Fifth and finally, each of the Plaintiff Hospital CEOs testified that their hospitals implement the practices Leapfrog describes as those that "safer hospitals do" with respect to the four imputed measures. (DAY 1 66:6—9, 154:2—15, 241:14—242:9, 78:25—799:18; 198:1-17).

One defense proffered by Leapfrog is that the assignment is warranted because hospitals decline to participate in the Survey to avoid disclosure of poor safety performance—what Leapfrog

27

calls the "non-response bias." (Day 2 at 188-89: 16-7).[8] It is my view that this position is evidence only of a certain hubris on Leapfrog's part. We cannot be blind to the fact that the Survey is reasonably time intensive. Leapfrog's emphasis on non-response bias de-values, against some of their own testimony, the burdens this Survey imposes. It was Dr. Romano's position that the decision not to participate stemmed from that burden. It was Ms. Alex Campione, the program manager, who although she appeared to run away from her deposition at trial, nevertheless testified that completing the Survey demands "a tremendous amount of resources." (DAY 2 at 254:16—18). Finally, Ms. Leah Binder, the Defendant's CEO, testified that the Survey would require "two weeks of staff time." (*Id.* at 96:24—25 – 97:1—5). Testimony at trial made clear that the burdens of the Survey, in conjunction with resource constraints, are more than adequate to explain a hospital's decision not to participate. Leapfrog simply failed to present persuasive evidence of any non-response bias that would operate to justify its decision to change the imputation model to remove the capability of non-participating hospitals to freeride on the scores of participating hospitals,

All of this leads to the conclusion that, although imputation may be a sound methodology as a general matter, *this* method of imputation is neither reliable nor defensible. Ultimately the testimony of Ms. Campione rings true. The assignment is "mathematically arbitrary." (DAY 2 at 289:13—15). The result is grades purporting to represent actual patient safety, when in truth they represent punishment for nonparticipation in the Leapfrog Survey.

---

[8] In contemporaneous messaging, two Leapfrog employees – Alex Campione and Missy Danforth, Senior Vice President of Healthcare Ratings, who lead the design of the safety grade scoring system – comment that low assignment "would be drastic" but, as Campione notes, "we have to assume at some point that hospitals not reporting likely have poor or lapse in performance." (DE 189-23 at 3).

### 4. *The Inevitable Outcome of Unreliability.*

The methods used by Leapfrog, and the various representations Leapfrog made to website users, results in a foreseeable outcome: Reviewing the grade, a patient is likely to rely on that information, and this makes the "F" grade much more significant.

As a general principle, ratings matter. This is so in all sorts of contexts – we commonly are asked to submit online reviews for products and services we use on a daily basis: hotels, restaurants, salons, appliances, etc. Consumer expectations of an F-grade likely assume a total failure to meet minimum standards. In the hotel or restaurant context, perhaps a consumer may be willing to take that risk. In decisions about health care, however, the situations can involve life and death situations, thereby prompting immediate avoidance.

At trial, Plaintiff's expert, Jonah Berger, a Marketing Professor at the Wharton School of Business, added an academic lens to common sense conclusions concerning consumer behavior. As Mr. Berger explained, hospitals are recognized as a "good" that is outside the expertise and knowledge of the average consumer, who must rely on outside sources for information about the hospital's quality. (DAY 2 at 7:14—19). Mr. Berger referred to "evaluative labels," which he described as "grades, A through F, colors, like a green, yellow, red, maybe a happy face, neutral face, frowned face," all of which "can help consumers interpret otherwise numerical information." (*Id.* at 9:6—8). Given the difficulty of making decisions on health care, consumers are likely to turn to heuristics that help simplify those decisions. As a result, it stands to reason that a consumer, upon seeing an "F," promulgated by a watchdog organization committed to helping those consumers, would understandably draw nothing but negative conclusions about that hospital's safety and, expectedly, avoid that hospital.

Testimony at trial suggests that a reasonable consumer may not understand that a hospital has been assigned a score, the basis for that assignment, nor would they understand the

29

methodology itself. Of course, a consumer may access and view the disclaimer footnote, and she may even review the scoring methodology herself, as Leapfrog points out – it's all *technically* there on the website. But a user's ability to access the information does not automatically absolve Leapfrog of liability for deceptive or unfair practices, particularly where the information is difficult to find.

While it may be true that "[t]he presence of true information or a disclaimer can rebut a claim of deception," *Kurimski v. Shell Oil Co.*, 570 F. Supp. 3d 1228, 1246 (S.D. Fla. 2021) (citing cases), no such rebuttal occurred here. Even if true information is available to the Leapfrog user, a reasonable consumer is still deceived if the process of uncovering that truth is an impenetrable series of clicks and scrolls, only to find an obscure reference to the methodology buried in a document consisting of dozens of pages and not even labeled as being intended for consumers.

First, a consumer, upon seeing the "F" grade may not investigate further. Thus, in many cases, the deception may be complete as soon as the grade is viewed.  But assuming they choose to investigate, the relevant footnote does not appear until and only when a user clicks or taps on one of the four measures for a non-participating hospital. Only then does an asterisk (*) appear next to the measure score underneath "This Hospital's Score." As mentioned above, the asterisk (*) is associated with a red, bolded footnote and states: "**\*The hospital declined to report their performance on this measure, so a score was assigned to reflect the lack of information available.**" ("Footnote 4"). Mr. Berger testified at trial that it required 23 clicks to arrive at Footnote 4.

Second, I find that most consumers are unlikely to ever locate Leapfrog's methodology document – the only place where a consumer could discover how Leapfrog's ratings *actually* work in terms of the tendency to cripple non-participating hospitals with failing scores. This is because the methodology document is buried within the Leapfrog website. On this issue, Plaintiffs offered

persuasive evidence in the form of Google Analytics, a service which tracks activity on websites.[9] The Google Analytics data showed that among all visitors to the Plaintiff Hospitals' Safety Grade webpages during the relevant period (between November 15, 2024 to August 4, 2025) approximately three percent accessed the Scoring Methodology document. (DE 203 at ¶ 100). From a hospital's individual Safety Grade webpage, a user must first click small, hyperlinked text located beneath individual measure descriptions stating, "For details on sources, click here," or alternatively click an inconspicuous "Detailed table view" link located at the top right of a hospital's profile webpage. (DE 187 at ¶ 335). From there, the user is met with a table replete with specific data, and to access the Scoring Methodology the user must then scroll to the bottom of the page and click a small, gray-font hyperlink stating, "For a full description of the methodology, click here." (*Id.* at ¶ 337). The Scoring Methodology reveals the imputation process on page 16. And the language describing this process is dense. Ms. Binder, for example, testified that the Scoring Methodology document "it is not meant to be used by the average lay person who would probably not be interested in reading all 26 pages." (DAY 3 at 70:11—14).

In sum, the average consumer is met with evaluative label after evaluative label and hinderance after hinderance before arriving at a complex methodology. In all likelihood, the user scrolled quickly to any non-failing hospital on the Safety Grade webpage. And all of this is what Leapfrog intended.[10] The resultant harms are foreseeable and potentially quite severe. Patient and

---

[9] Leapfrog argues that the Google Analytics data is unreliable and cannot serve as evidence of whether a reasonable consumer understood Defendant's website or whether any consumer was deceived. (DE 204 at ¶ 55). But this argument extends beyond the purpose of the Google Analytics data. I agree that it would not in itself serve as evidence of confusion or deception. Nevertheless, it certainly tends to show that consumers who have viewed all the initial information previously discussed are unlikely to continue on and review the methodology. In my view, it adds perspective to other testimony detailing how a consumer may access and review the methodology from the hospital's Safety Grade webpage, which requires them to take multiple steps.

[10] I am not persuaded by Leapfrog that its website is accessible to average consumers, insofar as it concerns arriving at and understanding the methodology. (DE 188-13). The UX testing report is

prospective employee views of the Plaintiff hospitals are likely adversely affected in a competitive health industry environment. Patients are likely to delay care and seek other options than the hospitals closest to them, or even the hospitals acutely equipped for the patient's particular needs or ailments. Presumably understanding the power of their ratings and the influence it could have, Leapfrog engaged in a targeted campaign against the Plaintiff Hospitals.[11] Leapfrog witnesses admitted that Leapfrog purchased Google advertisements using funds from a non-profit grant from Google to specifically target the Plaintiff Hospitals so that consumers in designated Florida zip codes searching for the Plaintiff Hospitals would be shown the failing Safety Grades. (DE 203 at ¶ 112); (*see also* DE 192-75 at 3 ("We'd also like to set it up so that when someone searches for any of the five specific hospitals, it shows an ad displaying their Hospital Safety Grade."))[12] The actual harms faced by the Plaintiff Hospitals, therefore, come as no surprise. Each of the CEO's testified to numerous harms, including patient confusion and erosion of community confidence caused by the Safety Grades.

---

clearly concerned with communicating the health scores and what they mean for patient safety, and how to use that information. (*Id.* at 3). But this is different from being able to understand how those scores are derived.

[11] Even beyond the marketing efforts discussed above, Leapfrog's Safety Grades natural garner significant attention. Millions of consumers visit Leapfrog's website (www.hospitalsafetygrade.org) each year, but the website is only the starting point. (*See* DE 163-4 at 104:8–14). The Fall 2024 Safety Grades alone generated "772 online articles from 435 different publications with a reach of 11.2 billion." (DE 193-76); (*see also* DAY 3 at. 11:7–10 (confirming "reach of 11.2 billion people")). A coverage report lists the total volume of coverage, including 722 online articles, 160 unique print placements, 239 broadcast placements, 444 press release pickups, and 85 hospital-issued publications. (DE 193-77 at 2). The Plaintiff Hospitals' Grades were featured in numerous news articles with headlines such as "bottom" and "worst South Florida hospitals for patient safety." (DE 193-104 at 1).

[12] It is worth noting here that patients are not the only members of the community who are likely to be harmed as a result of these grades. So too are the doctors, nurses, and other healthcare staff who may reasonably rely on Leapfrog Data in making employment decisions. Meanwhile, insurers and health plans would foreseeably rely on Leapfrog data when determining where beneficiaries should obtain medical care.

- Delray CEO Ms. Havericak testified regarding a patient who initially declined surgery at Delray because she was concerned about the Safety Grade and feared that she would "die" at the hospital. (DE 203 at ¶ 146).

- St. Mary's CEO, Cynthia McCauley, testified According to a brand analysis that measured the public's perception of St. Mary's from the fourth quarter of 2024 to the second quarter of 2025, the percentage of patients that would choose St. Mary's fell from 78 percent to 55 percent; "the only thing that changed in a year was the Leapfrog rating." (*Id.* at ¶ 165).

- West Boca CEO Mr. Hanlon described a patient identified as J.D. who presented to West Boca with a compound fracture of the finger—an open fracture carrying risks of infection and serious complications, including "loss of limb or life." (*Id.* at ¶ 173). Mr. Hanlon testified that West Boca was well-equipped to treat the injury— it is "one of the few hospitals in the county that [has] a dedicated hand surgery" unit, has "specialized physicians," and "perform[s] better than average" on surgical site infection metrics. Yet, this patient was initially admitted to West Boca Medical Center for urgent surgery but, as reflected in the contemporaneous record, he then "verbalized" that he "wanted to go to" a different hospital "against medical advice" "due to the leap frog reviews." (DE 191-36). Despite being advised by physicians and nursing staff of the risks of leaving against medical advice, the patient left West Boca after his daughter viewed the Leapfrog Safety Grade. (DE 203 at ¶ 173). Mr. Hanlon testified that J.D. incurred financial harm as a result of leaving West Boca against medical advice, including receiving a bill for the intake and treatment provided prior to his departure—cost that he would likely incur again at his subsequent treatment facility. (*Id.* at ¶ 174).

- Mr. Hanlon also testified regarding another patient, identified as F.W., who was admitted and scheduled for surgery at West Boca for an underarm infection but left against medical advice in the early morning hours after seeing media coverage related to West Boca's Safety Grade. Mr. Hanlon testified that F.W. also received a bill for care at West Boca, and, like J.D., would likely have been "double-billed" at a subsequent treatment facility. (*Id.* at ¶ 175).

- Good Samaritan CEO Ms. Montgomery testified that she explained the Survey process to the patient, but the patient instead sought care at Jupiter Medical Center, a competitor of the Community Hospitals and an "A" rated hospital as determined by Defendant. In my view, financial obligations aside, each instance of a patient delaying care is a significant and unnecessary harm resulting from the Safety Grades.

In addition to these specific instances, general trends tend to show the detrimental effects of the Hospital Safety Grade. Walk-ins declined at every hospital and the CEOs attributed those declines to the Safety Grades, after investigating other potential causes. (DE 203 at ¶ 249). Ms. Havericak testified that from 2024 through last year, Delray's EMS volume increased by about six percent, while walk-in emergency department volume *decreased* by approximately seven to eight percent. (*Id.* at ¶ 249). Or take West Boca, where Mr. Hanlon testified that emergency-department walk-in volume declined by approximately 15 percent from 2024 to 2025 when EMS volume (measuring instances where patients do not elect which hospital treat them) was down only three percent. (DAY 2 at 90:14—16). This narrative extended across all of the Plaintiff Hospitals.

Testimony also showed that patients presented to other hospitals "first" and were later transferred when those hospitals could not provide needed care, creating risks of delay in treatment. Take, for example, Ms. McCauley's testimony that during the same period in which walk-in

emergency department volume declined, the number of patients *transferred* to St. Mary's increased significantly, particularly from Jupiter Medical Center, a competing "A"-rated hospital. She testified that in her career at St. Mary's she has never seen transfers so high: In 2025, Jupiter Medical Center made 568 requests to transfer patients to St. Mary's, meaning patients are "choosing somewhere else first." (*Id.* at ¶ 168). This is even though, as Ms. McCauley testified, approximately half of the transfer requests involved pediatric patients, for whom St. Mary's serves as the region's only children's hospital and maintains 30 to 40 pediatric specialists. (*Id.* at ¶ 169).

Extending beyond patients, other third parties in the medical community are harmed by Defendant's actions. Insurers, among others, license the Safety Grades data. For example, in 2022 several groups entered into contracts with Leapfrog to obtain data for as low as $7,500 to as high as $252,607. (DE 194-41 at 8).

To be sure, I do not fault Leapfrog for engaging in this licensing structure to support their broader mission. But it is worth noting the relationship between the value of increased Survey participation and the significance of the data Leapfrog licenses. (*See e.g.,* DE 194-11 at 2 ("To maximize the value of The Leapfrog's Group Data for licensing purposes the level of participation should continue to be increased so it can be perceived as the most complete data set and thus allowing defense of our pricing model and its price points.")). It appears that the goal to maximize revenue came at the cost of comprehensive and accurate Safety Grades. The result is that various parties – the hospitals, their employees, the insurers, and of course the patients themselves – were and are foreseeably injured.

Additionally, letters sent by Humana Military to several of the hospitals urge them to address "their performance on safety measures" indicate further confusion. *(See e.g.,* DE 192-90). The Humana letter did not reflect any understanding that these hospitals did not participate in the Survey or that the Safety Grade resulted from nonparticipation, nor did it reference Leapfrog's

35

methodology. Instead, the letters reflect the misimpression that Leapfrog's Safety Grades measured the Plaintiff Hospitals' actual safety performance.

The outcome of this analysis is that the Methodology in conjunction with the representations made to the viewing public render Leapfrog's practices both unfair and deceptive.

They are unfair because under either test for unfairness – the FTC's 1980 or 1964 test – the record shows that Leapfrog uses the threat of arbitrarily assigned Safety Grades to coerce participation in the Survey among hospitals that are unwilling or unable to endure what one commentator described as "blackmail" designed to increase participation. (DE 194-145 at 1).

As mentioned above, the 1980 test requires me to find substantial consumer injury not outweighed by countervailing benefits to those consumers, who could not have reasonably avoided those injuries. First, as discussed, this produced substantial harm on a wide variety of consumers and is likely to continue producing a range of detrimental outcomes. Second, these injuries are "not outweighed by any countervailing benefits to consumers." *SMS Audio*, 2017 WL 11631378, at *3.[13] In my view, the only benefit of the deceptive methodology accrues to Leapfrog. Third, I find that consumers across the spectrum could not have reasonably avoided these injuries. Hospitals were effectively coerced into participation or else suffer a significant penalty, and their grades are broadcasted to viewers. (DE 163-4 at 187:8—22). Prospective patients are left unlikely to understand the assignment and its impact, nor are they likely to arrive at that explanation. Likewise, medical staff, employers, and insurers could not reasonably avoid the Safety Grades, which reach them through media coverage, employer dissemination, and search-driven targeted advertising, without an accompanying explanation of the methodology. Although these are more

---

[13] Defendant argued that the non-participation assignment increases participation and thereby improves safety, but a review of the facts establishes that no record supports a contention that the penalty improves safety outcomes.

sophisticated parties, it is my view that the various harms they experience sprawl from the negative feelings patients have or are likely to have as a result of seeing a failing grade.

Under the 1964 test, these same practices offend established public policy and are otherwise unscrupulous. The outcome of these acts is that they are substantially injurious to consumers. *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR, Inc.*, 842 So. 2d at 777). The record shows that Leapfrog's conduct evinces the kind of "deceptive and bullying conduct" that fits within established Florida public policy. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 213 (11th Cir. 2009). This bullying conduct is oppressive because non-participating hospitals face a severe penalty, and it is unscrupulous because the record shows that Leapfrog is not forthcoming to the public about how it calculates its Safety Grades or what they represent. And, once again, these practices produced real harms and those harms are likely to continue in the future.

### C. Remedy

I now turn to the appropriate remedies for Leapfrog's FDUTPA violation. For the reasons discussed below, permanent injunctive relief and declaratory relief are warranted.

A permanent injunction requires (1) actual success on the merits, (2) irreparable injury, (3) a balance of the equities that favors the Plaintiffs, and (4) consistency with the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). Each element of this test is satisfied here. First, the Plaintiff Hospitals have established actual success on the merits. Plaintiffs have establish that Leapfrog's Safety Grades, methodology, and associated representations are unfair (by distorting consumer choice and attempting to coerce hospital participation in Leapfrog Survey) and deceptive (by misleading consumers about how Leapfrog calculates its Safety Grades). Second, the Plaintiff Hospitals have established both ongoing and future irreparable injuries. Irreparable injuries are those that "cannot be undone through monetary remedies."

*Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). The "loss of customers and goodwill" has long been considered "irreparable." *Id.* Plaintiffs have adequately shown a range of harms including patient diversion and delay of care, physician concerns, insurer inquiries, and declines in patient volume. Third, the balance of the equities strongly favors the Plaintiff Hospitals. As discussed earlier, Leapfrog's practices harm the hospitals, insurers, employees, and patients; the only beneficiary of this methodology is the Leapfrog itself. This trade-off is simply not worth undermining trust in publicly disseminated safety information, even if it has the potential to encourage *some* hospitals to participate. Finally, relief for the Plaintiff Hospitals is in the public interest. The strong need "[t]o protect the consuming public and legitimate business enterprises" from "deceptive" and "unfair acts" emanating from the Florida Statute's description of the purpose of FDUTPA clearly supports Plaintiffs in this action. Fla. Stat. § 501.202(2).

In light of these findings, Plaintiffs request four discrete forms of injunctive relief. They first request that I enjoin Leapfrog from "assigning a Safety Grade to the [Plaintiff] Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores non-participating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades; or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data." (DE 203 at ¶ 288). They next request that I order Leapfrog, within five business days of judgment, to "withdraw from its websites and cease promoting the deceptive and unfair Safety Grades assigned to the [Plaintiff] Hospitals for Fall 2024, Spring 2025, and Fall 2025." (*Id.* at ¶ 288). *Third*, Plaintiffs ask that within 30 days of judgment, Leapfrog should be required to send "corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety

Grades were found to be deceptive and unfair in this action." (*Id.* at 293). Lastly, Plaintiffs request that Leapfrog "be required to place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next six cycles of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484." (*Id.* at 294).

Any such injunction should be broad enough to ensure that the Community Hospitals are afforded "complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As a result, courts in the consumer-protection context have authorized broad, multifaceted injunctions where necessary "to ensure future compliance" and that consumers are treated "fairly." *Corpay, Inc.*, 164 F.4th at 849 (affirming injunction compelling multiple disclosures and business reforms). At the same time, the Court is mindful that the injunction should be "no more burdensome to [Defendant] than necessary" to achieve those goals. *Califano*, 442 U.S. at 702.

As a preliminary matter, it is important to identify precisely what concerns me about Leapfrog's behavior. Leapfrog is effectively a watchdog organization which serves as a voice for transparency and a key catalyst in the public reporting of patient quality and safety data that is available to consumers today. (DAY 3 at 86:12—21). But serving as a watchdog does not mean that Leapfrog gains some right to Plaintiffs' private data. Further, recognizing its power and ability to influence consumer decisions as a watchdog, under the guise of patient safety, Leapfrog cannot use this leverage to pressure and penalize hospitals into participating. In other words, Leapfrog does not have a right to the benefit of Plaintiffs' participation; conversely, it does not have the right to punish them when they have not received that benefit.

As a result, any injunctive relief must clearly prevent a framework where Leapfrog may request data from the Plaintiff Hospitals and assign them scores if those hospitals do not participate. Upon review, I find that each of the requested forms of injunctive relief are appropriate,

except for Plaintiffs' fourth request, requiring corrective disclosures for the next six cycles. Although Leapfrog should still be required to provide corrective disclosures, requiring them do so for three years is excessive.

## CONCLUSION

In 2011, Leapfrog first embarked on developing the Safety Grade with the assistance of an Expert Panel. (DE 203 at ¶ 19). The Expert Panel's work, including its approach to handling missing data, was memorialized in a 2013 peer-reviewed publication. (*Id.*). That publication reflected the Expert Panel's judgment that the Safety Grades were comprised of composite scores "based on what was known about the hospital's performance, with no penalties for missing data" and to "avoid creating a structural bias in favor of Leapfrog-reporting hospitals." (*Id.* (citing PX-202.0)). The Defendant's Mission, a valiant one, has remained consistent, but it appears as though the Defendant has strayed from these founding principles. Accordingly, it hereby **ORDERED AND ADJUDGED** that Judgment should be entered against Defendant and in favor of Plaintiffs. The declaratory judgment will be entered by separate order.

## INJUNCTIVE RELIEF

Leapfrog, and Leapfrog's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, comply with the following commands:

1. Leapfrog must cease assigning a Safety Grade to the Community Hospitals under the current methodology or any similar methodology that: (i) assigns assumed or imputed values to calculate Safety Grades due to the lack of hospital-provided performance data; (ii) scores nonparticipating hospitals differently than participating hospitals by using different values or using differently weighted values to calculate Safety Grades;

or (iii) that otherwise reduces a hospital's Safety Grade due to the failure to provide performance data.

2. Within 5 business days of judgment, Leapfrog must withdraw from its websites and cease promoting the deceptive and unfair Safety Grades assigned to the Community Hospitals for Fall 2024, Spring 2025, and Fall 2025.

3. Within 30 days of judgment, Leapfrog must send corrective disclosures to all entities that paid to license the Fall 2024, Spring 2025, and Fall 2025 Safety Grades, disclosing that those Safety Grades were found to be deceptive and unfair in this action. Leapfrog must file a declaration documenting the reasonable and diligent efforts it has undertaken to accomplish this directive within 45 days of judgment.

4. Leapfrog must place the same corrective disclosures in future contracts, print and electronic advertising materials, and other print and electronic documents that promote paid licensure of the next cycle of Safety Grades accessible to or in the following five zip codes: 33401, 33407, 33410, 33428, and 33484.

5. Leapfrog must refrain from taking any action to circumvent the relief set out above. The Court retains jurisdiction to enforce compliance with these commands. *See Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012).

**SIGNED** in Chambers, at West Palm Beach, Florida, this 6th day of March, 2026.

Donald M. Middlebrooks
United States District Judge

cc.    Counsel of Record

41